Chief Judge Finm.
The questions posed in Matter of United Press Assns. v. Valente (308 N. Y. 71), concerning the right of the news media to challenge an order closing the trial of a pending criminal case to the public and the press, are again before us on this appeal, though in a materially different setting and involving altogether different considerations. Here, unlike in United Press, the issues are presented in the context of a clash between the constitutional guarantee of freedom of the press (U. S. Const., 1st Arndt.; N. Y. Const., art. I, § 8) and the constitutional right of an accused to a trial by an impartial jury free from the outside influences of prejudicial publicity. (U. S. Const., 5th, 6th and 14th Arndts.; N. Y. Const., art. I, §§ 2, 6. See, also, Sheppard v. Maxwell, 384 U. S. 333, 362; Estes v. Texas, 381 U. S. 532, 543.)
The present case stems from the prosecution of one Carmine Pérsico for the crimes, of conspiracy and extortion. The trial began in the Supreme Court, New York County, before Justice Postel and a jury on November 8, 1971, and, three days later, before any evidence had been presented, The New York Times and The Daily News published articles reciting that Pérsico had a criminal record and was reputed to have underworld connections. Claiming that these articles produced a prejudicial atmosphere which would prevent his client from receiving a fair trial, Pérsico’s counsel moved for a mistrial. Justice Postel (hereafter referred to as respondent), noting that he considered the articles unfair, polled the jury and, after ascertaining that no juror had read anything in the papers or seen anything on television concerning the case, denied the motion. He did, however, warn the news media, through remarks to the reporters present, that he would hold “ in contempt ” any “ individual reporter ” who “ report [ed] anything other than transpires *177 in this courtroom ” because it “would not be fair reporting insofar as this defendant is concerned.”
On the following two days, Friday, November 12 and Saturday, November 13, articles and editorials appeared in the Times, the News and The New York Post, which contained accounts of the respondent’s denial of the mistrial motion and referred to the previously published articles concerning Pérsico’s criminal record and associations. The articles were also strongly critical of the respondent’s threats of contempt. These items prompted the respondent on Monday, November 15, to address additional remarks from the bench to the reporters. He expressed displeasure with the articles and, at one point, took issue with the manner in which they portrayed him.
Immediately following these statements, Pérsico’s lawyer again moved for a mistrial or, in the alternative, “ for the exclusion of the public and the press ” for the balance of the trial. The assistant district attorney in charge of the prosecution opposed the application; he pointed out that there was no indication that the jurors had seen any of the articles and that, in any event, Pérsico’s rights would be adequately protected, and prejudice avoided, by “warning” the jury, “polling” it and, “if necessary * * * sequestering” it. The respondent, however, stating that the reporters ‘ ‘ have done indirectly what the Court has requested them not to do directly ” and that their reporting constituted ‘ ‘ contumacious conduct ’ ’, granted the motion and directed that the courtroom be closed to the press and public for the balance of the trial.
The petitioners—five newspapermen “individually and on behalf of other members of the public and press similarly situated ”— thereafter brought this article 78 proceeding for a judgment directing the respondent to reopen the courtroom. A divided Appellate Division dismissed the petition on the authority of our decision in the United Press case (308 N. Y. 71, supra), and the petitioners filed a notice of appeal to our court. About a week later, Pérsico’s trial ended with a verdict of acquittal in his favor.
Although the termination of that trial has rendered the appeal academic and moot, the questions presented, particularly since they are likely to recur, are of sufficient importance and interest to justify our entertaining it. (See, e.g., East Meadow Commu *178 nity Concerts Assn. v. Board of Educ., 18 N Y 2d 129,135; Matter of United Press Assns. v. Valente, 308 N. Y. 71, 76, supra; Matter of Rosenbluth v. Finkelstein, 300 N. Y. 402, 404; see, also, Cohen and Karger, Powers of the New York Court of Appeals, pp. 420-421.)
As they did in the court below, the petitioners — and amici curiae, including newspaper publishers and editors as well as radio and television broadcasters — contend that the exclusionary order violated not only the First Amendment’s guarantees of freedom of speech and of the press but also the public trial guarantee of the Sixth Amendment, now applicable to the States (see Duncan v. Louisiana, 391 U. S. 145,148), and section 4 of our Judiciary Law. Accordingly, they ask us to adopt a broader view of the reach of the First Amendment than that taken by the court in United Press (308 N. Y. 71, supra) and to determine the question, left undecided in that case, as to the scope and content of the provisions relating to a public trial.[1]
In United Press (308 N. Y. 71, supra), members of the news media had instituted an article 78 proceeding to restrain the judge from carrying out an exclusionary order entered during the criminal trial of one Minot Jelke. (See People v. Jelke, 308 N. Y. 56.) The petitioners based their claim upon the free speech-free press guarantees of the First Amendment of the Federal Constitution and upon section 4 of this State’s Judiciary Law and two other New York provisions (Civil Eights Law, § 12; former Code Crim. Pro., § 8). The latter two statutes provided in language identical with the Sixth Amendment—which at that time (1954) had not yet been held applicable to the States — that, “ [i]n all criminal prosecutions, the accused has a right io a *179 speedy and public trial Section 4 of the Judiciary Law, more broadly worded, recited, as it still does, that, subject to certain stated exceptions, “ [t]he sittings of every court within this state shall be public, and every citizen may freely attend the same.” Only six judges of our court participated in the appeal. We were unanimous in holding that the guarantees of the First Amendment were inapplicable since they did not operate ‘ ‘ to confer upon the press a constitutionally protected right of access to sources of information not available to others ” (308 N. Y., at p. 77). We were, however, equally divided on the question whether the foregoing statutory provisions, particularly section 4 of the Judiciary Law, gave members of the public at large, including the press, a right to attend court sessions and maintain a proceeding to enforce that right.
As we noted at the outset, the present case is quite different from United Press. Consequently, we find it unnecessary to reconsider the broad question there decided relating to the reach of the First Amendment or to determine the interpretation to be accorded the Sixth Amendment and section 4 of the Judiciary Law. In the earlier case, the order challenged was not aimed or directed at anything which the reporters had written or the newspapers had published. On the contrary, the courtroom was closed — over the objection of the defendant — solely in the interests of public decency and morality because of the obscene and sordid details of the testimony. In sharp contrast, the record in the present case makes it exceedingly plain that the order closing the courtroom — made upon the defendant’s application—was aimed specifically at the news media and was intended as a punishment for what the respondent characterized as their ‘1 contumacious conduct ’ ’ in disregarding his prior admonitions not to publish “ anything other than [what] transpires in this courtroom.” Since the petitioners before us were the direct targets of the court’s order, and their ability to comment upon the trial as professional journalists thereby impaired, there is no doubt that they have the requisite “ ‘ personal stake in the outcome of the controversy ’ ” to give them standing to challenge the validity of that order. (Flast v. Cohen, 392 U. S. 83, 99; see Data Processing Serv. v. Camp, 397 U. S. 150, 152; Barlow v. Collins, 397 U. S. 159, 172-173, per Brennan, J., concurring.)
*180 It is evident that, if the respondent had actually carried out his threat of punishment for contempt, his action would have clashed with the limitations on the contempt power mandated by the strictures of the First Amendment. (See, e.g., Bridges v. California, 314 U. S. 252, 263, 269; Craig v. Harney, 331 U. S. 367, 373-378; Wood v. Georgia, 370 U. S. 375, 383-385; see, also, State ex rel. Superior Ct. v. Sperry, 79 Wn. 2d 69; Phoenix Newspapers v. Superior Ct., 101 Ariz. 257.) As the cited cases demonstrate, the law is settled that the contempt power may not be utilized to impose punishment for the publication of out-of-court statements relating to a pending court proceeding, except where such statements are shown to present1 ‘ a clear and present danger ” or “ a serious and imminent threat ” to the administration of justice. (Bridges v. California, 314 U. S. 252, 263, supra; Craig v. Harney, 331 U. S. 367, 373, supra.)
The underlying rationale is that such punishment for contempt “ effectively discourage [s] ” free expression by the writer or publisher on matters of public interest in the same manner “ as if a deliberate statutory scheme of censorship had been adopted ” and thus falls under the ban of the First Amendment absent a showing of the requisite justification. (Bridges v. California, 314 U. S. 252, 269, supra.)[2] The respondent did not, it is true, actually hold any reporters in contempt. It is plain, however, as we have said, that his purpose was to punish and discipline the news media because of what had been written. Moreover, his threat of contempt, followed by his condemnation of the subsequent newspaper articles and editorials as u contumacious conduct ” and his order closing the trial because of such conduct, could not help but have a deterrent effect on free discussion by the press, substantially similar to that which would have resulted had punishment for contempt been imposed. Accordingly, even if we were to assume that such an order could ever be justified, and we do not here reach or consider that ques *181 tion, it could stand only upon a clear showing — similar to that required to sustain a contempt order — that it was necessary to meet a serious and imminent threat ” to “ the integrity of the trial.” (Craig v. Harney, 331 U. S. 367, 373, 377, supra.) We find no such showing in the record before us.
In point of fact, there is no support whatever for the respondent’s apparent conclusion that Pérsico could obtain a fair trial only if the courtroom was closed to the public and the press. The respondent was understandably concerned about the potential prejudicial effect of the newspaper articles, and he might well have been warranted in regarding them as contrary to the guidelines agreed upon and subscribed to by the New York Fair Trial Free Press Conference.[3] The significant fact, however, is that the respondent had determined, by questioning the jurors, that no one of them had read the articles, and there is likewise not the slightest showing or indication that any of them had seen the second series of news items which preceded the order closing the trial.
Moreover, since the articles complained of dealt with Pérsico’s alleged criminal record and underworld connections, and in no way related to any events which had transpired in the courtroom, their publication obviously would not, indeed could not, have been prevented by refusing to allow the press to attend the trial. In other words, even if the reporting in this case was improper and tended to prejudice the defendant, it is manifest that closing the trial was not the means to be employed to cure the prejudice or prevent a continuation of the impropriety.
*182 The problem of achieving a proper accommodation between the freedom of the press and the-right of an accused to a fair trial is a “ difficult and delicate ” one. (Maryland v. Baltimore Radio Show, 338 U. S. 912, 919, per Frankfurter, J.; see, also, Bridges v. California, 314 U. S. 252, 260, supra.) Because of the vital function served by the news media in guarding “against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism ’ ’, the Supreme Court has emphasized that it has been “ unwilling to place any direct limitations on the freedom traditionally exercised by the news media for ‘ [w]hat transpires in the court room is public property.’ ” (Sheppard v. Maxwell, 384 U. S. 333, 350, supra; see, also, Craig v. Harney, 331 U. S. 367, 374, supra; Bridges v. California, 314 U. S. 252, 263, supra.) This, though, imposes a heavy responsibility on the press, not alone to the accused on trial but to the administration of justice as well, to weigh carefully the potential impact of material considered for publication relating to a pending criminal prosecution lest there be a mistrial or a reversal on appeal.
Of course, as the Supreme Court observed in Sheppard (384 U. S., at p. 363), the problem of prejudicial publicity is one which the courts must meet not by the mere “palliative” of declaring a mistrial or reversing a conviction but, rather, by taking appropriate remedial steps “by rule and regulation” to “ protect their processes from prejudicial outside interference.” (See, also, Jaffe, Trial by Newspaper, 40 N. Y. U. L. Rev. 504, 522 et seq.) In most instances, the trial judge will be able to deal effectively with potential prejudice stemming from adverse press publicity by cautioning the jurors to avoid exposure to such publicity and by carefully instructing them to disregard any prejudicial material, which might come to their attention, that was not presented to them in court.[4] However, there may well be extreme situations —■ in no way comparable to the present case—in which such procedures may be inadequate and ineffectual to assure a fair trial. The court may then find it necessary to sequester the *183 jury for the duration of the trial. (See, e.g., State ex rel. Superior Ct. v. Sperry, 79 Wn. 2d 69, 92-93, per Finley, J., concurring, supra.) But whether the judge would have the power in any such case to close the courtroom to the public and the press in order to protect the defendant’s right to a fair trial is, as already indicated, a question we need not here pass upon.
In short, then, it is our conclusion that the respondent’s order was an unwarranted effort to punish and censor the press, and the fact that it constituted a novel form of censorship cannot insulate or shield it from constitutional attack. In the area of ‘ ‘ indispensable ’ ’ First Amendment liberties, the Supreme Court has been careful “ not to limit [their] protection * * * to any particular way of abridging it ” (Grosjean v. American Press Co., 297 U. S. 233, 249; see, also, Communications Assn. v. Douds, 339 U. S. 382, 402; N.A.A.C.P. v. Alabama, 357 U. S. 449, 461), since “ abridgment of such rights, even though unintended, may inevitably follow from varied forms of governmental action.” (N.A.A.C.P. v. Alabama, 357 U. S. 449, 461, supra.)
The conclusion we have reached would ordinarily lead to a reversal and the granting of the relief sought by the petitioners. However, since the questions presented by this appeal became academic and moot when the trial came to an end, and the relief requested would now serve no purpose, the order appealed from should be modified, without costs, to the extent of dismissing the petition solely for that reason.
Judges Scileppi, Bergan, Breitel, Jasen and Gibson concur with Chief Judge Fuld ; Judge Burke in result.
Ordered accordingly.

. More specifically, with, respect to the First Amehdment, the petitioners argue that any governmental restrictions on access to information should presumptively be held invalid, except in cases involving the traditionally private deliberations of a court or legislative committee in executive session, or material traditionally treated as confidential, and that, subject only to those exceptions, the burden should be upon government to establish a justification for any such restrictions. In support of their position, they point to Federal decisions, rendered since 1954, which have expanded the scope and reach of the First Amendment in other areas. (See, e.g., New York Times v. Sullivan, 376 U. S. 254; Red Lion Broadcasting Co. v. FCC, 395 U. S. 367; New York Times Co. v. United States, 403 U. S. 713; Caldwell v. United States, 434 F. 2d 1081, cert, granted. 402 U. S. 942.)

. Although the Supreme Court has indicated that a trial judge’s power to punish for contempt might be somewhat greater in those cases in which the extrajudicial statements affect a pending trial before a jury, as distinguished from a nonjury case (see Wood v. Georgia, 370 U. S. 375, 389-390, supra), the fact remains that the exercise of the contempt power even in jury cases would still require a substantial showing of justification in order to avoid the condemnation of the First Amendment.

. Representatives of the news media, the bar, bench and law enforcement agencies in New York, recognizing the importance of harmonizing the First Amendment’s guarantee of free press and the Sixth Amendment’s of fair trial, organized the Fair Trial Free Press Conference in 1969. Reaffirming the “ equal validity ” of the two constitutional guarantees, the Conference declared that “ The proper administration of justice is the concern of the judiciary, bar, the prosecution, law enforcement personnel, news media and the public. None should relinquish its share in that concern.” Moreover, the Conference guidelines, after reciting that “ All concerned should be aware of the dangers of prejudice in making pretrial disclosure of * * * Statements as to the character or reputation of an accused person ”, go on to state that “ [t]he public disclosure of [prior criminal charges and convictions] by the news media may be highly prejudicial without any significant addition to the public’s need to be informed. Publication of such information should be carefully considered by the news media.”

. In some instances, it might also be appropriate for the judge expressly to proscribe “ extrajudicial statements by any lawyer, party, witness, or court officer [divulging] prejudicial matters.” (Sheppard v. Maxwell, 384 U. S. 333, 361, supra.)