Martin Evans, J.
This is a motion by defendant and his attorneys for an order vacating and setting aside a prior order of this court, made without objection by counsel on June 21, 1976, during the jury selection, in which the court ordered "I will instruct the clerk to give no information out. These instructions also apply to the lawyers. In other words, in a case of this nature, you are not to discuss it with anybody except, of course, for the purpose of the preparation of the *781 trial * * * lawyers, judge and court clerks * * * don’t talk about it.”
Jury selection took approximately six weeks, and this motion was formally made on August 5, 1976, after some four days of trial.
Representatives of the various newspapers who were present were advised by the court that they would be permitted to intervene in this motion if they so desired, by reason of their interest in the matter, but apparently they have chosen not to appear.
The motion is grounded on the proposition that the order is an interference with the rights of the attorneys, granted to them under the First Amendment to the Constitution of the United States, to express their thoughts concerning this case in the form of public speech and, presumably although not so stated, in any other form they desired.
On the first oral argument of the motion, and in their brief, defendant’s counsel have stated that they would fulfill their obligations under the Code of Professional Responsibility approved by the American Bar Association and adopted by the New York State Bar Association, but at a second oral argument their position was that they were not limited by these standards, but that their right of free speech was as extensive as the right of the press to publish whatever the press wished to publish, as that right has been defined by the Supreme Court of the United States.
The affidavit of defense counsel, dated August 5, 1976, shows that they desire the "full airing of the case to the public, which has a right to hear all sides of the case as they are not required to determine the guilt of innocence of the defendant and are not under the same restrictions relevant to the evidence in the case as is the jury.”
The extent of the right of the public to attend criminal trials, and the right of the press to publish, for the better information of our citizens not only the public proceedings of a trial but also to express its own opinions and views, have been well delineated, in the context of balancing the Sixth Amendment right of a defendant to a trial free of prejudice with the right of the public to be present at a trial under the Sixth Amendment, and the right of our society to have the press report its observations and opinions for the better information of the members of our society. An additional factor, under which the rights created by the First and Sixth Amend- *782 merits are subsumed, and which is occasionally adverted to in the decided cases, is the basic right of our society, which has created courts by reason of the United States Constitution (art III) and the New York State Constitution (art VI), in order to "establish Justice” (see the "purpose clause” in the Preamble to the United States Constitution) to trials which are fairly and properly administered. As to public trials, see Matter of Oliver (333 US 257); Matter of Oliver v Postel (30 NY2d 171). As to the right of the press to publish opinions, see Bridges v California (314 US 252); Pennekamp v Florida (328 US 331); and to publish trial proceedings, see Nebraska Press Assn. v Stuart (427 US 539).
Prior restraint on the liberty of the press in order to maintain the basic value of a trial, fairly and properly administered, and free of prejudice, is permissible, but only after an adequate balancing of the elements and factors involved makes it appear that "the gravity of the 'evil’ (i.e., the inability to hold the trial properly administered free of prejudice, coercion and intimidation) discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.” (Dennis v United States, 183 F2d 201, 212, affd 341 US 494, 510.)
Among the elements and factors which must be considered are the type and degree of danger to be apprehended, and availability and relative desirability of other measures, and the effect of these other measures not only upon the fair administration of justice in a particular case, but upon the rights of persons who are subjected to these measures.
Thus, postponement of a trial may result in death or unavailability of witnesses; sequestration of jurors, although sanctioned by history and precedent (1 Holdsworth, History of English Law, pp 318-319; Estes v United States, 335 F2d 609) clearly deprives innocent men and women of their liberty, even when they are not hearing evidence, and can amount in some cases to imprisonment for a greater period of time than would a sentence for a criminal misdemeanor. Sequestration, by itself, may create sufficient improper pressures on a juror so that an unfair trial would result.
The type of danger to the substantive values involved, the degree of that danger to be apprehended and its imminence, are infinitely variable in general; and even in a particular case it may be extremely difficult, if not impossible, to anticipate all of the acts verbal or otherwise that may result in *783 violation of the goals which are sought. The mind of man is infinite in variety; and prejudice, or a loss in the integrity of the truth finding process may result from public pressure on jurors, disclosure to potential witnesses of the testimony that has already been given; the disclosure by counsel through public statement of what he expects the testimony of a witness will be, his opinion of the credibility of evidence, and many other matters. Some witnesses may come forward when a trial is publicized; others, hearing reports of what counsel expects to do, may flee the jurisdiction.
It is to avoid any interference with the integrity of the judicial process that trial courts have been invested by custom and tradition with wide powers. Indeed, in this very case, defense counsel has requested that this court direct witnesses who have completed their testimony and who have been discharged as witnesses to refrain from making public statements of their testimony.
There is no question but that the instant case has engendered wide publicity, as evidenced by the many newspaper accounts not only at the time of the underlying incident, but also during the selection of the jury and during the trial itself. That this has already resulted in potential harm has been demonstrated by one incident. Defense counsel apparently made a statement, reported in the newspapers, in which he referred to certain potential evidence. This potential evidence has not yet been offered or received in the case, and it is not clear at this time that it will be. After the publication of the newspaper report, one juror requested that the jury be advised as to when they could hear that particular evidence. Thus, although the jurors have been admonished with respect to newspaper articles, their minds may, nevertheless, been affected.
In addition, public figures, such as Muhammad Ali and Angela Davis have appeared in the courtroom as friends of the defendant, and one, Mr. Ali, was reported in the press to have stated that he was attending as a moral witness for his friend whom he then described as a deeply religious man. By reason of the relationship between the chief counsel for the defense, Mr. Saad El-Amin, and Mr. Ali, it is possible, although the court expresses no opinion on the matter, that Mr. Ali’s statement was an indirect means of creating an "atmosphere” to surround this case. If the statement was relevant, it could have been made under oath as a witness where his *784 knowledge and credibility could have been tested in the proper manner.
The stated desire by defense counsel to give a "full airing of the case to the public” would certainly lead to a repetition of this type of persuasion, and possibly, to public or private coercion on some of the jurors.
The movants, while conceding that the court does possess the power to prohibit them, and court personnel, from discussing the case with the public through the press, argue that this power can be exercised only where there is a clear and present danger, and only where the conduct of the attorneys is shown to be a serious and imminent threat to the proper administration of justice.
The "clear and present danger” phrase has been given wide currency since its use in Schenck v United States (249 US 47, 52), but as a phrase, its meaning is difficult to ascertain. "This Court has not yet fixed the standard by which to determine when a danger shall be deemed clear; how remote the danger may be and yet be deemed present.” (Whitney v California, 274 US 357, 374.)
"What is meant by clear and present danger to a fair administration of justice? No definition could give an answer.” (Pennekamp v Florida, 328 US 331, 348, supra.) "Whether the threat to the impartial and orderly administration of justice must be clear and present or a grave and immediate danger, a real and substantial threat, one which is close and direct or one which disturbs the court’s sense of fairness depends upon a choice of words. Under any one of the phrases, reviewing courts are brought in cases of this type to appraise the comment on a balance between the desirability of free discussion and the necessity for fair adjudication, free from interruption of its processes.” (Pennekamp, supra, p 336.)
"The truth is that the clear-and-present danger test is an oversimplified judgment unless it takes into account also of a number of other factors: the relative seriousness of the danger in comparison with the value of the occasion for speech or political activity; the availability of more moderate controls than those which the state has imposed; and perhaps the specific intent with which the speech or activity is launched. No matter how rapidly we utter the phrase clear and present danger, or how closely we hyphenate the words, they are not a substitute for the weighing of values. They tend to convey a delusion of certitude when what is most certain is the com *785 plexity of strands in the web of freedoms which the judge must disentangle.” (Freund, Understanding the Supreme Court, pp 27-28.)
The phrasing of the test, "clear and present danger”, has since been modified so that, at this time, the court, if that test controls, must determine whether "the gravity of the ’evil’ discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.” (Dennis v United States, 183 F2d 201, 212, supra; Nebraska Press Assn. v Stuart, 427 US 539, 562, supra.)
This test, however, has been applied by the Supreme Court only to publications, especially through newspapers, and has not been applied to the limited group of persons who are the participants in a particular trial such as attorneys, court personnel, witnesses, jurors and parties.
These stand on a different footing. To a great extent, they acquire information not as general members of the public, but by virtue of their status and employment.
Much of this information is received by them in a privileged capacity and, like many people who acquire information in this manner, either as a result of their licensed status or employment, their right to divulge this information, to exercise their First Amendment rights of free speech, is subject to constraint. This has been an accepted rule for such a long period of time that it has rarely, if ever, been questioned. It has found legislative sanction in the various privilege statutes (CPLR 4502-4505; US Code, tit 29, § 160, subd [c] [legislative sanction preventing unfair labor practice which can include speech]; judicial sanction in many cases such as NLRB v Gissel Packing Co., 395 US 575, 616-620, and ethical sanction in the many codes of professional conduct, such as canon 4 of the Lawyers Code of Professional Responsibility).
It is necessary in analyzing the decided cases to distinguish between those in which the question before the court was the limitation on the right of the press or other people who were not then before a court to say and to publish what they desired, and those cases in which the question was the limitation imposed upon the attorneys, court personnel, witnesses and parties.
With respect to the limitations on attorneys, in the few cases which have passed upon this point, the standards used by the various State and Federal courts are in some conflict.
*786 The Seventh Circuit has applied the test of "serious and imminent threat to the administration of justice” relying upon Craig v Harney (330 US 367, 373) which, however, was a case involving freedom of the press. The Seventh Circuit in the first of two cases did not adopt either a standard of "clear and present danger” or "reasonable likelihood of interference.” (Chase v Robson, 435 F2d 1059 [a case involving a restraining order].) But in Chicago Council of Lawyers v Bauer (522 F2d 242) a case for the declaratory judgment of the validity of a general court rule, the court adopted the same rule that governs publication by the press. In the Ninth and Tenth Circuits, a "reasonable likelihood” is the standard. (Farr v Pitchess, 522 F2d 464 [a contempt case based on a restraining order promulgated on the parties, attorneys and witnesses]; United States v Tijerina, 412 F2d 661.)
In Hirschkop v Virginia State Bar (ED Va Civ No. 74-0243-R, decided July 30, 1976), in a well-reasoned and comprehensive opinion, the court in rejecting the tests of the Seventh Circuit declared that rule DR 7-107 of the Code of Professional Responsibility (which adopted the test of "a reasonable likelihood” of interference with a fair trial) was constitutionally valid.
In Rosato v Superior Ct. of Fresno County (51 Cal App 3d 190), the Court of Appeals for the Fifth District of California upheld a contempt order which was ultimately based on the existence of an order in the case of People v Stefano (Case No. 28498, Superior Ct, Fresno County, Cal) which restrained certain public utterances of attorneys, parties, judicial officers and employees and public officials, jurors and witnesses. The standard adopted in the Rosato case was that the statements " 'may interfere’ with the rights of the defendant to a fair trial and disrupt the orderly administration of justice.”
The distinction between the limitation of the right of the press and public to discuss and comment and the limitation on attorneys in a particular case has, although not directly raised in any case before the Supreme Court, been adverted to by the court.
As early as Pennekamp v Florida (328 US 331, 361, supra), Frankfurter, J., in a concurring opinion, discussing public dissemination of matters "intended to influence proceedings or inevitably calculated to disturb the course of justice” referred with obvious approval (pp 361-362, n 9) to the recommendations of the American Bar Association which included the rule *787 "[t]hat broadcasting of arguments, giving out of argumentive press bulletins, and every other form of argument or discussion addressed to the public, by lawyers in the case during the progress of the litigation be definitely forbidden.”
In Sheppard v Maxwell (384 US 333, 361) the Supreme Court stated: "More specifically, the trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters, such as the refusal of Sheppard to submit to interrogation or take any lie detector tests; any statements made by Sheppard to officials; the identity of prospective witnesses or their probable testimony; any belief in guilt or innocence; or like statements concerning the merits of the case. See State v. Van Duyne, 43 N. J. 369, 389, 204 A. 2d 841, 852 (1964), in which the court interpreted Canon 20 of the American Bar Association’s Canons of Professional Ethics to prohibit such statements.”
In Nebraska Press Assn. v Stuart (427 US 539, 564, supra), the court said: "This Court has outlined other measures short of prior restraints on publication tending to blunt the impact of pretrial publicity. See Sheppard v. Maxwell, 384 U. S., at 361-362. Professional studies have filled out these suggestions, recommending that trial courts in appropriate cases limit what the contending lawyers, the police, and witnesses may say to anyone. See American Bar Association, Project on Standards for Criminal Justice, Fair Trial and Free Press 2-15 (Approved Draft, 1968).”
It is therefore clear that the Supreme Court has indicated that the tests that must be applied to publication by newspapers, before publication by them may be enjoined, are stricter than the tests which may be applied to attorneys, parties, jurors, witnesses and court personnel. The references with obvious approval; first in Pennekamp v Florida (supra), to the recommendations of the American Bar Association, thereafter, in Sheppard v Maxwell (supra), to the interpretation of the New Jersey Court of canon 20 of their Code of Professional Ethics, and most recently, in Nebraska Press Assn. v Stuart (supra), to the various professional suggestions and American Bar Association Standards, clearly point the way to adoption of the test that extrajudicial statements made by a member of the limited classes referred to may be enjoined if the statements are "reasonably likely” to interfere with a fair trial.
This test, applied to these limited classes, is logically re *788 quired. For if the more strict test, applied to newspapers and other independent publications were required to be applied, then this limited class could not be enjoined unless the independent publications were also enjoined; and if the independent publications were able to be enjoined in a particular case, then there would be no purpose in a separate order also enjoining a limited class. By setting up this limited class of private persons, therefore, it is clear that a different test must be applied to them.
Significantly, in the very recent case of Rosato v Superior Ct. of Fresno County (51 Cal App 3d 190, supra), an application was made to the Supreme Court for certiorari. The petition filed on December 29, 1975 (No. 75-9191) shows that there was presented to the Supreme Court, among other matters, the conflict among the various Federal Circuits and among the States, in the standards which were used, and argued that the standard used by the California courts "that the judge need only be satisfied that there is a reasonable likelihood of prejudicial news which would tend to prevent a fair trial” was too low.
Certiorari was denied (427 US 912), thus permitting that standard to be used.
The weight of the several serious professional studies of this question during the past years also supports this conclusion. From the early studies by the American Bar Association, through the "Reardon” report, to the Code of Professional Responsibility which was adopted by the American Bar Association and which has been adopted by the Bar Associations of almost all of our States, and which has been adopted by the New York State Bar Association, it must be concluded that the reasonableness of this type of limitation has been approved by almost every experienced, thoughtful and scholarly person who has considered the question.
The adoption of these standards by the State Bar Association has, in addition, another element. By its adoption, enforcement of it becomes State action, and its adoption, therefore, becomes State action. Although not adopted by the Legislature, it was adopted by a coequal branch of government, in the exercise of its discretion. And it should be kept in mind that the Supreme Court in Gitlow v New York (268 US 652, 670), made the observation that when "the legislative body has determined generally, in the constitutional exercise of its discretion, that utterances of a certain kind involve such *789 danger of substantive evil that they may be punished, the question whether any specific utterance coming within the prohibited class is likely, in and of itself, to bring about the substantive evil, is not open to consideration.”
Thus, this court concludes that the court has the power to restrain extrajudicial statements of attorneys, parties, witnesses, jurors and court personnel, whenever, in the opinion of the court, such statements have a reasonable likelihood of tending to prevent a fair trial, free of prejudice and properly administered.
It is clear that the type of statements which are likely to be made in this case have this reasonable likelihood of tending to prevent a fair trial. In fact, even if measured by the more strict test, the statements which have already been made, and the publicity given to them, would have this result.
The court also has the duty to consider whether other methods, short of this restriction, are available. Defense counsel have suggested the sequestration of the jurors as a means to this end.
Sequestration is nothing more than an euphemism for a serious restriction of a citizen’s valued constitutional rights, that of liberty, and when balancing the deprivation of this, for 16 persons, during an extended period of time, against the restriction of public dissemination of limited matters, of a few persons, the balance should, in the opinion of this court, be struck as it has been.
Defense counsel also contend that the order restraining them is overbroad; that it goes even beyond the requirements set forth in the Code of Professional Responsibility. In this contention, they are correct. At the time the order was made, the jurors were in the process of being selected, and it was necessary, at that time, to insure that no statements, of any nature, be made, in order to obtain an impartial jury. At this time, however, trial evidence has been received both in the form of testimony and of exhibits. Although exhibits continue to be the property of their owner, and may be under the control of particular attorneys at a particular time, their existence, when they have been received in evidence, is a public matter.
Therefore, substantially adopting the wording of the order in the case of People v Stefano (Case No. 28498, Superior Ct, Cal, supra) which was the order under consideration in the contempt proceedings entitled Rosato v Superior Ct. of Fresno *790 County (51 Cal App 3d 190, supra), in order to fulfill the duty of this court to conduct a trial free of prejudice and properly administered, and by reason of the obvious interest of the news media and its consequent publicity, and in view of the clear desire of defense counsel to present to the public, through the news media, matters which may or may not be proper evidence in this case and matters which would tend to improperly influence the jurors, and which may interfere with the constitutional right of the defendant to a fair trial, and may interfere with the proper administration of justice, the court hereby modifies its prior order so that it reads as follows: It is the order of this court that no party to this action, nor any attorney connected with this case as defense counsel or prosecutor, nor any other attorney, nor any judicial officer or employee, nor any member of the police department, nor any agent, deputy or employee of such person, nor any grand juror or juror, nor any witness having appeared before the Grand Jury or before the trial jury, nor any person subpoenaed to appear at the trial of this action, shall release or authorize the release for public dissemination of any purported extrajudicial statement of the defendant or of witnesses relating to this case, nor shall any such person release or authorize the release of any documents, exhibits or any other evidence which has not been received in evidence in this case, nor shall any such person express, except as required to do so in court, any opinion or make any comment for public discussion as to the weight, value, effect or comparison of evidence; nor shall any such person make any statements unless required to do so in court as to the nature, substance or effect of any testimony that has been given. Nor shall any such person make any statement as to the identity of any prospective witness, or his probable testimony, or the effect thereof. Nor shall any person make any out-of-court statement as to the nature, source or effect of any purported evidence alleged to have been accumulated as the result of the investigation of this matter. Nor shall any such person make any statement as to the content, nature, substance or effect of any testimony which may be given in any proceeding related to this case except that a witness may discuss any matter with an attorney of record or agent thereof.
This order does not limit any such persons from stating the following:
(1) A factual statement of the defendant’s name or names, age or residence.
*791 (2) The time and place of the arrest, the identity of the arresting and investigating officers and agencies and the length of the investigation.
(3) The test of the charges, including a brief description of the offenses charged.
(4) Exact quotations from or reference to, without comment, any evidence given to the trial jury in this case.
(5) The scheduling and result of any stage of the judicial proceeding held in open court before the jury or in a public session.
(6) A request for assistance in obtaining evidence, or the names of possible witnesses.
(7) Any information as to any person not in custody who is sought as a possible suspect or witness, or any statement aimed at warning the public of any possible danger either to, or from such person not in custody.
This order does not prohibit any such person from showing to anyone else any exhibit which has been unconditionally received in evidence in this case, but does not require that such person show such exhibit upon any request.
This order does not preclude any such person from discussing any matter in this case with any other such person, or with any potential witness.
It is further ordered that a copy of this order be attached to any subpoena served on any witness or potential witness in this matter, and that the return of service of the subpoena shall also include the fact of the service of a copy of this order.
This order shall be in force until the discharge of the trial jurors from further service in this case.