Chief Judge Wachtler
(dissenting). The question presented by this case is whether article I, § 8 of our State Constitution, which affirmatively guarantees the freedom of expression, is to be interpreted in light of modern conditions so as to preserve its underlying purpose and vitality. Because the majority opinion unnecessarily restricts the applicability of article I, § 8, and its decision will adversely affect the ability of many persons and organizations to express their views, I dissent.
*509 The Smith Haven Mall (hereinafter the Mall) is the largest retail center in Suffolk County, and is one of only 18 shopping centers in New York which contain over 1 million square feet of interior space (see, Shopping Center World, at 53 [Jan. 1985]). As found by the lower courts, the Mall was designed to encourage the public to congregate and linger, and it contains several large seating areas. Furthermore, the Mall permits its facilities to be used for a large number of public purposes and community activities, including charity auctions, presentations by the Boy Scouts and Girl Scouts, recruitment efforts by universities and the Armed Forces, voter registration drives by the League of Women Voters, promotional events by local towns, and the provision of free health services. Plaintiffs’ attempts to distribute leaflets caused no greater interference with the commercial interests of the Mall than any of these activities do. On each of the two occasions when the representatives of the plaintiff organizations came to the Mall, they stood under the portico outside of the main entrance to the Mali’s building. Ignored by the majority is the finding by the lower courts — as had been conceded by the Mall in its answer —that the plaintiffs’ activities did not in any manner disrupt the Mall’s operation.
It is true that the Supreme Court has held that the First Amendment to the United States Constitution does not protect leafletting in a privately owned shopping center (see, Lloyd Corp. v Tanner 407 US 551; Hudgens v NLRB, 424 US 507). The Supreme Court has also acknowledged, however, that a State may recognize broader free speech rights on private property as a matter of State law without violating any Federal constitutional rights of the property owner. In PruneYard Shopping Center v Robins (447 US 74), the court held that California’s recognition of a State constitutional right to solicit signatures for petitions in shopping malls did not infringe upon either the Federal property, due process or First Amendment rights of the mall owners. Addressing the same claims as were made by the shopping center owner in this case, the United States Supreme Court found that this State-imposed limitation on the mall owners’ right to exclude was not a taking of their property " 'in the constitutional sense’ ” because there was no indication that it would "unreasonably impair the value or use of their property as a shopping center” (id., at pp 82-83). The Supreme Court specifically noted, in support of this conclusion, that the mall owner was permitted to adopt time, place and manner regulations on the *510 expressive activity so as to minimize any interference with the mall’s commercial functions.
Article I, § 8, originally adopted as article VII, § 8 of the New York State Constitution of 1821, states in relevant part: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.” It is significant that, although the First Amendment of the United States Constitution had been ratified 30 years earlier, the drafters of the free speech section at the 1821 New York State Constitutional Convention chose not to follow the language of that provision.[1] Rather, the language chosen, an affirmative grant of the" freedom of expression to all citizens, followed by a separate clause limiting legislative action, was the same as had been adopted in several other States (see, e.g., Pa Const of 1790, art IX, § 7, cited in 8 Swindler, Sources and Documents of United States Constitutions, at 292; Miss Const of 1817, art I, § 6, cited in id., vol 5, at 348; Conn Const of 1818, art I, § 5, cited in id., vol 2, at 145; Me Const of 1819, art I, § 4, cited in id., vol 4, at 315).[2]
The discussion of the free speech provision at the 1821 Convention was confined almost exclusively to that portion of the provision concerning prosecutions for libels (see, Carter and Stone, Reports of the Proceedings and Debates of the Convention of 1821, at 163-173), and the proceedings do not reveal any specific intent with regard to the extent of the *511 "State action” requirement in article I, § 8. While the majority also relies on statements made at the 1967 Constitutional Convention (majority opn, at p 504, n 6), such statements, of course, are entirely irrelevant with regard to the meaning of article I, § 8, adopted 146 years earlier. The absence of any evidence of specific intent which would dictate the result in this case is not surprising. Article I, § 8 was drafted in 1821, long before shopping malls existed. Nor was there any indication then that privately owned property would come to replace town squares and downtown business districts as the public gathering centers in many communities. The majority apparently views constitutional provisions as inflexible law to be interpreted precisely as the framers did at the time of their adoption, and thus finds article I, § 8 inapplicable here, regardless of what present-day circumstances are.
I do not dispute that the history of a constitutional provision is important, and particularly where the proceedings of a constitutional convention reveal a specific and limited purpose for a provision, it may be dispositive (see, e.g., Matter of Esler v Walters, 56 NY2d 306, 313-314). Still, we have before us in this case a brief provision adopted in 1821 after little discussion which, in broad and general terms, sets forth a basic ideal of a democracy. It is largely because of the willingness of courts to interpret such constitutional provisions in light of changing conditions that our freedoms have remained intact and our Constitutions have survived for so long. As stated by Chief Justice Marshall 166 years ago, a Constitution is "intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs.” (M’Culloch v Maryland, 4 Wheat [17 US] 316, 415.)
In Brown v Board of Educ. (347 US 483), the Supreme Court had to determine whether the equal protection clause in the Fourteenth Amendment required that States provide integrated public schools, rather than ones which were "separate but equal.” The court conceded that it could not rely upon the specific intent underlying the provision, as the relevant history was inconclusive as to whether integrated schools were to be required. Instead, the court stated: "[W]e cannot turn the clock back to 1868 when the Amendment was adopted * * * We must consider public education in the light of its full development and its present place in American life throughout the Nation. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal *512 protection of the laws” (347 US, at pp 492-493 [emphasis supplied]).
Here too, given the obvious absence of specific intent, we must consider whether article I, § 8 protects plaintiffs’ activities in light of the purpose underlying the provision and the role of large shopping malls in modern society. The proceedings of the 1821 Constitutional Convention reveal that the free speech provision, as an integral part of the Bill of Rights, was proposed primarily to express the view that fundamental principles of individual liberties were safeguarded under New York law (see, Carter and Stone, Reports of the Proceedings and Debates of the Convention of 1821, at 102). There can be little doubt, of course, that the right of free expression is one of our most cherished liberties and is essential for the functioning of a democracy (see, e.g., Matter of Oliver v Postel, 30 NY2d 171, 183; Matter of Steinbeck v Gerosa, 4 NY2d 302, 313-314, appeal dismissed 358 US 39; Cox, Freedom of Expression, at 1-5). The question thus becomes whether protecting the peaceful and orderly exercise of free speech in a large shopping mall is required to uphold the fundamental values enshrined in article I, § 8.
Free speech rights are only valuable if there are adequate means of communication available to those who wish to express a view. Inexpensive channels of communication which provide direct access to large numbers of people are often essential for effective expression (see, e.g., Martin v City of Struthers, 319 US 141, 146). To this end, the distribution of leaflets or handbills in places where people gather has long been recognized as vital for the preservation of a meaningful freedom of speech (see, e.g., Martin v City of Struthers, 319 US, at pp 146-147, supra; Schneider v State, 308 US 147, 162).
Historically, town squares and downtown business districts were the public gathering centers for communities (see, e.g., Alderwood Assoc. v Washington Envtl. Council, 96 Wn 2d 230, 239, 635 P2d 108, 114; Note, Private Abridgment of Speech and the State Constitutions, 90 Yale LJ 165, 168). Not surprisingly, public parks, streets and sidewalks came to be recognized as traditional public forums where expressive activity such as leafletting received its greatest protection (see, e.g., Shuttlesworth v Birmingham, 394 US 147, 152; Jamison v Texas, 318 US 413, 415-416; Schneider v State, 308 US 147, 163, supra; Hague v C. I. O., 307 US 496, 515-516). When the significance of streets and sidewalks as public forums was *513 being developed in the 1930’s and 1940’s, privately owned shopping centers were virtually nonexistent; as late as 1950 there were fewer than 100 of them in the entire country (Eagle, Shopping Center Control: The Developer Besieged, 51 J Urb L 585, 589). By now, this number is greater than 25,000 (see, Shopping Center World, at 55 [Jan. 1985]), and, more importantly, privately owned shopping centers have, in many communities, replaced downtown business districts as the public gathering centers (see, e.g., Food Employees v Logan Plaza, 391 US 308, 318, 324; Robins v PruneYard Shopping Center, 23 Cal 3d 899, 907, 910, 592 P2d 341, 345, 347, affd 447 US 74).
This displacement is most pronounced with respect to the large regional malls which contain numerous facilities other than retail shops and thereby encourage lengthy and frequent visits to the premises (see, Note, Private Abridgment of Speech and the State Constitutions, 90 Yale LJ, at 168). Again, the number of such malls has been dramatically increasing during the past 25 to 30 years (see, Sternleib and Hughes, Shopping Centers: U.S.A., at 180, 189), and New York has seen no exception to this trend (see, Shopping Center World, at 53 [Jan. 1985]; id., at 66, 78 [Jan. 1981]).
The facts found by the lower courts with respect to the Smith Haven Mall demonstrate the significant role that large regional shopping malls play as public gathering places. Almost one half of all its customers do not ordinarily shop at any other shopping centers, and its broad range of facilities insure that many of a person’s shopping, business, entertainment and personal needs can be met there. The Mall promotes itself as a place for the public to congregate and linger, and the fact that it permits its facilities to be used for numerous public purposes, and does grant access to certain groups for the dissemination of information, belies any assertion that the premises are limited exclusively to commercial functions. The conclusion, reached by the lower courts, that the Mall has all of the attributes of a downtown business area or town center is inescapable.
It is also evident that, in light of the large number of people who congregate at the Mall, the exercise of free speech by those who seek to communicate with the general public will be adversely affected by a complete denial of access to the Mall. As the Supreme Court has sustained the constitutionality of a Federal statute prohibiting the placement of un *514 stamped materials in homeowners’ mailboxes (see, United States Postal Serv. v Greenburgh Civic Assns., 453 US 114), a group without the funds needed for mass mailings or advertisements in the mass media will be effectively precluded from expressing its views to the public in those portions of New York, such as Suffolk County, where privately owned malls have become the primary public gathering places.[3]
The majority dwells on the requirement of State action under article I, § 8, and on the absence of the traditional indicia of State action set forth in the context of equal protection and due process claims. However, because the Mall, though privately owned, has, through its size, nature of use and broad invitation to the public, become the functional equivalent of a traditional public forum, and because a complete denial of access will have a significant adverse effect on the dissemination of ideas in the community, any requirement of State action under article I, § 8 has been satisfied, and the Mall should not be able to ban the distribution of leaflets on its premises. The mall owner, of course, would be entitled to adopt time, place and manner restrictions on the leafletting designed to prevent any interference with the commercial functions of the Mall (see, PruneYard Shopping Center v Robins, 447 US, at p 83; id., at pp 96-97 [Powell, J., concurring]; Robins v PruneYard Shopping Center, 23 Cal 3d, at p 910, 592 P2d, at p 347, supra; Batchelder v Allied Stores Intl., 388 Mass 83, 92, 445 NE2d 590, 595).
Our State Constitution is an innovative document. It was intended to ensure that rights and privileges granted in the past would be preserved in the future under changing conditions. In the past, those who had ideas they wished to communicate to the public had the unquestioned right to disseminate those ideas in the open marketplace. Now that the marketplace has a roof over it, and is called a mall, we should not abridge that right.
Judges Jasen, Simons, Kaye and Alexander concur with Judge Titone; Judge Jasen concurs in a separate concurring opinion; Chief Judge Wachtler dissents and votes to affirm in another opinion in which Judge Meyer concurs.
Order reversed, with costs, defendant’s motion for summary judgment granted, plaintiffs’ motion for summary judgment *515 denied, and judgment granted in favor of defendant declaring that plaintiffs have no right to distribute leaflets on defendant’s property, contrary to defendant’s wishes.

. The First Amendment provides that "Congress shall make no law * * * abridging the freedom of speech”.

. In Sharrock v Dell Buick-Cadillac (45 NY2d 152), we recognized the importance of .such linguistic differences from a parallel provision of the United States Constitution in determining whether to interpret a State constitutional provision more broadly than its Federal counterpart. In Sharrock, we relied largely on "the unique language of the due process clause of the New York Constitution” and more specifically, on the absence of "any language requiring State action” (id., at pp 159, 160), in holding that the State provision did not contain the same State action requirement as that in the 14th Amendment to the United States Constitution. The majority’s claim that the first clause of article I, §8 "was aimed at curbing legislation concerning defamation” (majority opn, at p 500, n 4) is unsupported by either the text of the provision, the second sentence of which specifically provides that in a prosecution for libel "if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives * * * the party shall be acquitted”, or by Professor Chaffee’s statement cited by the majority, which unambiguously refers to this second sentence.

. The harm to those groups which need personal contact with the public, such as to collect signatures for a petition, will, of course, be even more pronounced.