(July 14, 1992)

■ In the Matter of WILLIAM P. SULLIVAN, an Attorney, Respondent. COMMITTEE ON PROFESSIONAL STANDARDS, THIRD JUDICIAL DEPARTMENT, Petitioner.—Per Curiam. Respondent is an attorney admitted to practice by this court in 1968. He maintains an office for the practice of law in the City of Ithaca, Tompkins County.

Petitioner, the Committee on Professional Standards, by petition dated May 6, 1991, has accused respondent of violating the Code of Professional Responsibility DR 7-107 (A) and (B) (22 NYCRR 1200.38 [a], [b]), in that, while representing a criminal defendant in a felony jury trial, he made extrajudicial statements in a live television broadcast which he knew or reasonably should have known would have a substantial likelihood of materially prejudicing the proceeding. On February 11, 1992, petitioner's motion for an order declaring that no factual issues were raised by the petition and respondent's answer was granted (see, 22 NYCRR 806.5).

At the time of the television broadcast, respondent and the District Attorney had concluded presenting evidence in a Tompkins County murder trial which generated enormous publicity and public interest. Because the factual context is important, we recount it in some detail as described by the District Attorney in his letter complaint to petitioner and in respondent's affirmation in reply.

On the morning of December 23, 1989, State Police officers discovered the four members of the Warren Harris family dead and burned in their home in the Town of Dryden, Tompkins County. Three of the four family members, the father, the mother, and the 11-year-old son, had been bound, hooded and shot in the head. The fourth family member, a 15-year-old daughter, was found in a separate room, naked, and also shot in the head. The fire was set by means of a flammable accelerant spread over the victims after they were dead. A gasoline can with fingerprints on it was found on the first floor of the house. On the afternoon of the day the bodies were found, Mr. Harris's VISA card was used four times by a man at malls in Cayuga and Onondaga Counties and Mrs. Harris's VISA card was used four times by a woman in the same malls.

After an intensive investigation revealing, among other things, that the fingerprints on the downstairs gas can belonged to respondent's client, Shirley Kinge, the police arrested her on February 7, 1990. They attempted to arrest her

son Michael Kinge at a different location at the same time, but he confronted the police with a shotgun and was killed. In Shirley Kinge's apartment the police found two of the items purchased with Mrs. Harris's credit card. In Michael Kinge's apartment, the police found the murder weapon as well as three of the items purchased with Mr. Harris's credit card. Shirley Kinge gave a statement to the police confessing that she used the credit card but denying that she had ever been at the Harris home.

Respondent was assigned to represent Shirley Kinge in February 1990 by the Dryden Town Judge on charges of murder, arson, and burglary. In March 1990, she was indicted for burglary, arson, hindering prosecution, criminal possession of stolen property, and forgery.

Following extensive pretrial proceedings, the trial of Shirley Kinge began July 23, 1990 with jury selection. The prosecution began presenting evidence on August 13, 1990. The prosecution's theory was that Michael Kinge killed the Harrises, that Shirley Kinge arrived thereafter to assist him in burning the bodies and the house to cover up the crime, and that Shirley Kinge accompanied Michael Kinge to the malls to use the credit cards stolen from the Harris home. The presentation of evidence included 116 witnesses, 82 called by the prosecution and 34 by the defense. Shirley Kinge did not testify at the trial. Both sides rested on November 8, 1990. Summations were presented to the jury the following week. Shirley Kinge was found guilty on November 16 by jury verdict on all counts charged against her. Respondent has been assigned to represent Kinge on appeal to this court.

The trial court issued an order permitting unprecedented local gavel-to-gavel live television coverage of the trial. An Ithaca-based television newschannel (News Center 7) and the Tompkins County cable channel franchise preempted the cable weather channel and broadcast all permissible parts of the trial on a live and gavel-to-gavel basis. The live coverage would begin as soon as the Trial Judge ascended to the Bench and terminated when he left the Bench. The television production crew had several pre-arranged screens so that an appropriate message could be instantly flashed on the feed during recesses, lunch breaks, and the like (for example, one screen might state: "The Shirley Kinge trial is in recess at this time; coverage will be resumed as soon as the recess is ended"). Other extensive media coverage was provided through newspapers, local radio stations, which may have broadcast por-

tions of the trial live, Syracuse television stations, and other local and regional media representatives.

Throughout the trial and, in particular, at the close of virtually each day's proceedings before excusing the jury, the court admonished the jury not to read or listen to media accounts of the trial proceedings. Furthermore, each of the jurors selected assured both counsel and the court during the voir dire proceedings that they would not listen to or read any media accounts of the trial during the trial.

After the close of all the evidence on November 8, 1990, respondent spoke briefly for 5 or 10 minutes to both local and regional reporters in the courthouse lobby about the trial. After respondent left the courthouse, he met Molly Cummings, news director of News Center 7. She advised him that she missed his brief courthouse news conference but that she had a cancellation for the "live interview" portion of that evening's newscast and invited respondent to be briefly interviewed at that time. Respondent accepted and the interview was broadcast live on the 6:00 P.M. news and replayed hourly until 11:00 P.M. The cable news broadcast reaches thousands of homes in Tompkins County. The District Attorney made an audio tape of the interview by placing a cassette recorder in front of the television during the newscast. He also made a transcript of the interview.

During the interview with Cummings, respondent briefly discussed the potential testimony of two individuals who did not testify (the defendant Shirley Kinge and one Joanna White) and the excluded testimony of an expert witness, Professor Charles Ewing. White was Michael Kinge's friend. When questioned by police on February 7, 1990, she admitted that she gave Michael Kinge a ride to the vicinity of the crime, knowing he was intending to commit a crime. The prosecution considered using White as a prosecution witness but decided not to. She was arrested in July 1990, 11 days prior to the commencement of jury selection in the Kinge trial, and thereafter indicted for criminal facilitation and hindering criminal prosecution.

The relevant portions of the television interview, as transcribed by the District Attorney, read as follows:

"MC:[1] Bill, what went through your mind in deciding whether or not to put the defendant, Shirley Kinge, on the stand?

1. MC: Molly Cummings.

"WS:[2] That was a matter, Molly, that we had considered from the beginning and really didn't make up our minds until very near the end of the trial. In weighing the considerations, it was our feeling that the prosecutor did not prove the case and there was nothing that could be added by having Shirley testify at this time. Her statement that was made to the police on February 7th is in evidence. We'll have to talk about that with the jury and what weight should be given to it, but that's before the jury. The testimony that she would give wouldn't be able to add a whole lot with respect to the events of February 7, except that she would again have denied that she was present at the Harris home or had anything to do with any of the crimes in the Harris home.

"MC: One of the last witnesses that we saw, but the jury didn't see, was your psychological expert for Shirley, Charles Ewing. That was a disappointment to you? The jury didn't get to hear what he had to say.

"WS: Well that was one of the two real blows in the case. In working through the defense it was our thought that there were two key parts of it. One would be when Mr. Ewing would testify and talk about the psychological beating that Shirley Kinge had taken that morning and her psychological condition at the time and show that in truth and in fact the testimony of some of the other witnesses just couldn't have happened the way they said it happened, particularly after they claimed that she regained her composure in fifteen minutes. That's number one. Number two, when Joanna White was not permitted to testify by her attorney, we felt that under the circumstances—particularly with the way the District Attorney had manipulated, first with charging Joanna with a misdemeanor, and then raising the stakes by charging a felony, all in order, we think, to keep Joanna off the stand—we think that's wrong. Joanna would have testified that Michael had told her that, among other things, she would have testified to a lot of things, but among other things, that Michael Kinge had told her that he had set the fire, he was responsible for the deaths of the Harrises and that Shirley—from that the jury could have found clearly that Shirley was not involved. We think that was a blow as well."

The single charge of the petition against respondent accuses him, in three specifications, of violating the Code of Professional Responsibility DR 7-107 (A) and (B). DR 7-107 (A) states that: "A lawyer participating in or associated with a criminal

2. WS: respondent.

or civil matter shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding."

DR 7-107 (B) states that a "statement ordinarily is likely to prejudice materially an adjudicative proceeding when it refers to a * * * criminal matter * * * and the statement relates to" certain listed types of information. The listed types are broadly inclusive and relevantly include, *inter alia,* the expected testimony of a witness, the existence or contents of any confession, admission, or statement given by a criminal defendant, and information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial.

DR 7-107 (C) lists statements a lawyer involved with the investigation or litigation of a matter may make without elaboration "[p]rovided that the statement complies with DR 7-107 (A)" *(e.g.,* the general nature of the claim or defense; the information contained in a public record).

DR 7-107 (A) sets forth a general rule prohibiting public communications by a lawyer which the lawyer knows or reasonably should know will have a substantial likelihood of materially prejudicing an adjudicative proceeding. Subdivision (B) then puts the attorney on notice that certain kinds of statements ordinarily are likely to materially prejudice an adjudicative proceeding and, presumably should be generally avoided. Subdivision (C) allows the attorney to make public statements about narrowly defined categories of information; even then the statements are impermissible if they run afoul of the general prohibition of DR 7-107 (A). The purpose of DR 7-107 appears to be to insulate the trial process, and especially jurors, from efforts by attorneys to influence the outcome of the proceeding through extrajudicial means *(see, e.g.,* EC 7-33).

Specification 1 of the charge alleges that respondent's statements about Shirley Kinge's potential testimony violated DR 7-107. Specification 2 alleges that respondent's statement briefly summarizing the excluded testimony of forensic psychologist Charles Ewing violated DR 7-107. Specification 3 alleges that respondent's statements about Joanna White's potential testimony violated DR 7-107.

Respondent argues for dismissal of the petition because DR 7-107 is being unconstitutionally applied and because his statements did not violate DR 7-107.

We find the latter argument persuasive. Under the particular circumstances of this trial, we are unable to conclude that respondent knew or reasonably should have known that his brief television interview would have a substantial likelihood of materially prejudicing the proceeding.

First, with respect to specification 1, defendant Kinge's statement/confession was admitted into evidence by testimony from police officers and by documentary proof. Because the gist of her potential testimony was already before the jury, respondent's remarks concerning it did not pose a substantial likelihood of materially prejudicing the proceeding.

Second, the unsequestered jury was frequently admonished to avoid media accounts of the trial, such as respondent's television interview. While such admonishments are not an impenetrable shield to potentially prejudicial influences, it was not unreasonable for respondent to credit their efficacy. Therefore respondent could have reasonably assumed the jury would not view his television interview and that it would therefore not have a substantial likelihood of materially prejudicing the trial. *(See, Matter of Oliver v Postel,* 30 NY2d 171, 182-183.)

Even if respondent assumed that regardless of admonishments or instructions from the Trial Judge, one or more jurors in this case might be exposed to potentially prejudicial media influence such that respondent would be on notice that certain kinds of statements to the media might have a substantial likelihood of materially prejudicing the trial, we nevertheless find that the statements in issue here did not violate DR 7-107.

Respondent's television interview was a mere drop in the ocean of publicity surrounding this trial, and indeed, all of the matters remarked upon by respondent had been otherwise publicized prior to the interview. For example, two days prior to the interview, The Ithaca Journal and The Post-Standard in Syracuse both carried prominent articles detailing the testimony given by Dr. Ewing in court, in the absence of the jury, which the trial court disallowed. While we acknowledge that a public extrajudicial statement by a defense attorney generally carries more authoritative weight than media publicity *(see, Gentile v State Bar,* 501 US —, 111 S Ct 2720, 2745), respondent's brief interview, given during the publicity-saturated circumstances of this trial, was not of a kind to so qualitatively alter public knowledge or mood that he should have known it would carry a substantial likelihood of materially prejudicing the proceeding.

In view of the above rationale, we do not reach respondent's constitutional arguments grounded upon both the United States and New York Constitutions, except to note the ample discussion with respect to the former in *Gentile v State Bar (supra)*.

In sum, respondent's public extrajudicial statements, at the time of their utterance, were not such that he knew or reasonably should have known that they would have a substantial likelihood of materially prejudicing the trial and therefore were not violative of DR 7-107.

The petition of charges and specifications against respondent is dismissed.

Weiss, P. J., Mikoll, Yesawich Jr., Crew III and Casey, JJ., concur. Ordered that the petition of charges and specifications against respondent be and hereby is dismissed.