In the Matter of the NEW YORK TIMES COMPANY et al., Petitioners, v JOHN R. STARKEY, as Justice of the Supreme Court, Respondent.

In the Matter of NEW YORK NEWS INC., Petitioner, v JOHN R. STARKEY, as Justice of the Supreme Court, Respondent.

Second Department, January 30, 1976

*Cahill Gordon & Reindel (Floyd Abrams, Eugene R. Scheiman* and *Dean Ringel* of counsel), for New York Times Company and others, petitioners.

*Townley, Updike, Carter & Rodgers (Richard J. Barnes* and *Peter C. Gould* of counsel), for New York News Inc., petitioner.

*Louis J. Lefkowitz, Attorney-General (Dominick Tuminaro* of counsel), for respondent.

*Farrell, Diamond & Kalina (Vincent D. Farrell* and *Arthur L. Diamond* of counsel), for New York Press Club, Inc., *amicus curiae.*

HOPKINS, Acting P. J. The respondent, a Justice of the Supreme Court, Kings County, is presiding at a criminal trial which commenced on January 13, 1976. The defendant Car-

son, and five codefendants, are on trial, charged with the alleged murder of one Philip Williams on May 23, 1973. The defendants are also charged with kidnapping, robbery and burglary. On January 13, 1976, the first day of the trial, the respondent admonished petitioner Kleiman, a reporter for petitioner the New York Times, and a Mr. Liberman, a reporter for the New York Post, not to report anything about the case, except what transpired in the courtroom. The respondent advised petitioner Kleiman and Liberman "not to go into any background at all".

On January 15, 1976 the New York Times printed an article by Ms. Kleiman which referred to a previous trial and conviction in Nassau County of defendant Carson and four of his codefendants herein on charges of kidnapping and to the conviction of two codefendants herein of attempted murder, stemming from events which took place on the same evening as the alleged crimes for which these defendants are being tried in Kings County.

That morning, in open court, counsel for defendant Carson read the article written by petitioner Kleiman to the respondent in the absence of the jury. The respondent then ascertained from petitioner Kleiman, who was then in the courtroom, that she had indeed written the article, and had considered respondent's admonishment of January 13, 1976 to be a request and not an order. The respondent stated that it had been an order, and that any future disregard thereof would lead to a contempt citation.

That afternoon counsel for the New York Times appeared before the respondent and moved to vacate the oral order and, alternatively, moved for a stay thereof. Counsel argued that, as a matter of constitutional law, the respondent could not impose any prior restraint upon the press. The respondent denied the motion and stated that he had the duty to balance the constitutional guarantee of a free press against the paramount rights of the defendants to a fair trial. Counsel asked the respondent whether he intended to reduce his oral order to writing. The respondent indicated that it was not necessary to do so as his oral order was on the record.

Immediately thereafter the New York Times commenced this proceeding seeking the vacatur of the respondent's oral orders and moved for a stay of those orders pending a determination by this court. The Times' request for a temporary restraining order in its order to show cause was denied by a

member of this court. However, it continued to publish articles containing information about defendants' criminal backgrounds, in disregard of the respondent's order.

While this proceeding was pending before this court, the respondent signed a written order, dated and entered on January 20, 1976, which was effective as of January 13, 1976, prohibiting the New York Times, the New York Post, the New York Daily News, Ms. Kleiman and Mr. Liberman from "printing and publishing any criminal background on any or all of the defendants herein and more particularly any matter against these defendants in Nassau County pertaining to these defendants in any proceeding arising out of the subject matter of the within indictment currently on trial in Kings County for the reasons set forth by this court in the trial minutes of January 13, 1976, and January 15, 1976". Both counsel for petitioners the New York Times and Kleiman and the Attorney-General, as counsel for the respondent, have stipulated that the respondent's written order "is and may be considered as a part of the record in the above-entitled proceedings."

On January 23, 1976, the New York Daily News instituted a similar proceeding against the respondent and moved for a stay of respondent's written order of January 20, 1976. Both proceedings were thereupon consolidated by this court for disposition.

The preliminary issue as to the propriety of this proceeding may be quickly resolved. A proceeding under CPLR article 78 lies to determine the constitutional rights of the press to report criminal trials and orders of the court affecting those rights (*Matter of Oliver v Postel*, 30 NY2d 171; cf. *La Rocca v Lane*, 37 NY2d 575). Such a proceeding satisfies the need for the expeditious consideration of the constitutional rights of the press during a pending trial.

Two questions essentially are presented by the parties: First, the existence of the trial court's authority to issue the orders under review; and second, assuming that the authority exists, the nature of the conditions under which such orders may be properly issued. The First Amendment establishes the freedom of the press to report events and to disseminate news, as well as to express opinion. The Sixth Amendment establishes the right of a defendant in a criminal prosecution to a fair trial. At times these constitutional rights inevitably collide. Both occupy in our system a preferential position as indispensable privileges. First Amendment rights may not be

diluted except for a compelling State interest *(National Assn. for Advancement of Colored People v Button,* 371 US 415, 439; *Freedman v Maryland,* 380 US 51, 56). Even so, the preservation of a fair trial is "the most fundamental of all freedoms" *(Estes v Texas,* 381 US 532, 540-541).

The power to enforce these rights, to give content and meaning to these ancient commandments, must reside in the courts, as the ultimate arbiters of disputes having constitutional dimensions. In exercising the power of enforcement, the right to a fair trial may require the issuance of an order, temporary in duration, forbidding the publication by the press of information prejudicial to a defendant on trial *(Branzburg v Hayes,* 408 US 665, 685; *Shepherd v Florida,* 341 US 50, 53; *Rideau v Louisiana,* 373 US 723).

The existence of the court's authority to issue such an order, however, is only the beginning to the process of deciding whether the order ought to be issued. Precisely because "a responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field" *(Sheppard v Maxwell,* 384 US 333, 350), and because the press is the instrument by which the public is informed of current events, only the most exigent circumstances warrant the issuance of an order curtailing the right of the press to publish. All other measures within the power of the court to insure a fair trial must be found to be unavailing or deficient. No invasion of the freedom of the press should be sanctioned unless it appears clearly on the record that the court has inquired into the potential danger to the defendant if the prejudicial information is published, that on substantial grounds it appears that the defendant will be deprived of a fair trial as a result, and that the danger cannot be avoided or minimized by other means, such as by sequestering the jury, or through proper instructions to the jury (cf. *Times-Picayune Pub. Corp. v Schulingkamp,* 419 US 1301). In short, an order directing the press not to publish the information ought to be the last resort of the court.

Moreover, due process and the delicate accommodation of the constitutional privileges require that the inquiry of the court should be made in advance of the trial, and on notice to the parties and to the press and to other interested media.*

---

* The inquiry might be joined with a consideration of a defendant's application for a change of venue (cf. *People v Luedecke,* 22 AD2d 636; *People v Martin,* 19 AD2d 804).

The procedure should generally follow the guidelines recommended by the Legal Advisory Committee on Fair Trial and Free Press (62 ABAJ 63-64; see discussions in Landau, Fair Trial and Free Press: A Due Process Proposal, *id.,* pp 55–59, and Roney, The Bar Answers the Challenge, *id.,* pp 60–63). In most criminal cases action by the court will not be necessary; only in the rare case—the case which through the force of its circumstances becomes newsworthy to the degree that daily coverage of the proceedings is warranted—will the court be compelled to consider the issue whether a fair trial might be prevented through the publication of prejudicial information.

In this case the record before us is clear that no such inquiry of this character was made by the court; nor indeed that any findings were declared on the record establishing that the ultimate resort to the restrictions on the press were justified under the circumstances. Indeed, from the record, it appears that the jurors have been instructed not to read the newspapers, and have been heeding those instructions scrupulously. Nor does it appear from the record that the trial court has given consideration to the alternative measure of sequestering the jury. In the absence of a hearing, on notice to the parties and the press, and findings based on substantial grounds, the orders under review cannot stand (cf. *United States v Schiavo,* 504 F2d 1; *United States v Dickinson,* 465 F2d 496; *Chase v Robson,* 435 F2d 1059; *Younger v Smith,* 30 Cal App 3d 138, 153–156).

Accordingly, the petition is granted.

SHAPIRO, J. (concurring in result). If the majority opinion merely *assumed* the existence of power in the courts to issue "an order, temporary in duration, forbidding the publication by the press of information prejudicial to a defendant on trial" and then went on to conclude, as it does, that in any event "in this case the record before us is clear * * * that the ultimate resort to the restrictions on the press were [not] justified under the circumstances", I could have associated myself with that opinion. However, despite the absence of any need, as I see it, to reach the issue of constitutionality, the majority has seen fit to pass upon that issue and to determine that "at times [the right of the press under the First Amendment freely to report events and disseminate news and the right of a defendant to a fair trial under the Sixth Amendment] inevitably collide". I do not agree with that conclusion for I am firmly of the opinion that the press, and all other

communications media, may not, under the strictures of the First Amendment, be enjoined from publishing information with regard to pending judicial criminal proceedings.

The First Amendment, so far as is here material, reads: "Congress shall make no law * * * abridging the freedom of speech, or of the press". This language should be taken at face value and not frittered away by exceptions. It means, and should be interpreted to mean, that any law or order mandating, authorizing or directing prior restraint of the press does direct violence to its very heart and purpose.

Since our founding fathers drew the Constitution, and its enactment into our fundamental law by the States, the Supreme Court of the United States has never in any case sustained a prior restraint order; in this bicentennial year of our existence as a democracy this court should not now do what that court has refrained from doing despite the many cases it has had before it in which such restraints have been sought.

The supposed conflict between a free press and fair trial may be a reality, although in 50 years as a member of the Bar of the State (most of it spent in a courtroom) I have not found it to be so, but that conflict, if there be one, is not truly the issue here. The harm, if any, done by any unrestrained publication of news, usually occurs long before a defendant goes to trial and to that harm this case cannot, and does not, address itself, for we are here concerned with publication of news *after* the commencement of a trial.

The majority of this court, by its approval of prior restraint —a fancy legal phrase for "gag"—and its assumption of an inevitable collision between a fair trial and a free press, implicitly denigrates the ability and ingenuity of our Trial Justices to devise appropriate steps, within constitutional limits, to protect a defendant in his right to a fair trial. Furthermore, it assumes that jurors will not heed the directions of the court as to what they may and may not consider, an assumption which experience shows is not founded in fact.[1]

My learned brother Mr. Justice HOPKINS suggests that before making a prior restraint order, the trial bench "should generally follow the guidelines recommended by the Legal

---

1. In this connection I note that, despite massive and nationwide detrimental publicity, former Attorney General Mitchell was acquitted in New York and former Secretary of the Treasury Connally was acquitted in Washington.

Advisory Committee on Fair Trial and Free Press", but in doing so he seemingly overlooks the fact that in proposing these guidelines, which have not yet received, and may not receive, the approval of the House of Delegates of the American Bar Association, the committee itself stated that it "does not intend to recommend or encourage the use of judicial restrictive orders" and that it "specifically recommends against the issuance of any orders which would impose direct restraints on the press" (62 ABAJ 63). Thus Mr. Justice HOPKINS has adopted for utilization by Trial Judges in imposing prior restraints, as a rule of law, a statement intended for the guidance of the Bench to avoid "the apparent ever-increasing tension between the courts and the press in executing their respective functions" *if* such order is to be made, but has disregarded the portion of the recommendation which states: "It is clear that the free flow of information concerning court business is important and necessary not only to the requirements of a free press and a fair and public trial, but to greater public understanding of the judicial function and the rule of law in our society."

While the press has "sometimes been outrageously abusive, untruthful, arrogant and hypocritical" (Stewart, Or of the Press, 26 Hastings LJ 631, 636), "prior restraints fall on speech with a brutality and a finality all their own" and therefore violate "the hypothesis of the First Amendment that injury is inflicted on our society when we stifle the immediacy of speech" (Bickel, The Morality of Consent, p 61).

It should be emphasized that we are here dealing with an attempt to impose a direct "gag" on the press and not with the issuance of a restrictive order directed against court personnel, or attorneys, or others directly involved in the judicial process. In this connection, and after enumerating the propriety of the use of such restraints to protect a defendant's right to a fair trial, the Supreme Court, in *Sheppard v Maxwell* (384 US 333, 350) pointedly noted, that: "any direct limitations on the freedom traditionally exercised by the news media" was not a permissible restraint.

In an article entitled "The Doctrine of Prior Restraint" (20 Law & Contemp Prob 648), Professor Emerson notes that the First Amendment was developed directly out of attempts to license the press and that (p 662) "nothing in the growth of modern society has, thus far at least, appealed to the country

as grounds for altering the considerations which led to the elimination of prior restraint upon the press."

Whether undue frenetic activity of the press should be curbed should never be a matter for court decision.[2] If there is to be such authorization it should come from the people through an amendment of *their* Constitution and by *their* choice and not by court limitation on the purpose and intent of the First Amendment to permit the American people to enjoy the benefits—and sometimes the detriments—of a free and untrammeled press.

For more than two centuries the unwritten canon of judicial restraint has been the hallmark of our jurisprudence. As the immortal CARDOZO once wrote: "A jurist is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness"; and as Justice WHITE, in his concurring opinion in *Miami Herald Pub. Co. v Tornillo* (418 US 241, 259) said: "According to our accepted jurisprudence, the First Amendment erects a virtually insurmountable barrier between government and the print media so far as government tampering, in advance of publication, with news and editorial content is concerned. *New York Times Co. v. United States,* 403 U. S. 713 (1971). A newspaper or magazine is not a public utility subject to 'reasonable' governmental regulation in matters affecting the exercise of journalistic judgment as to what shall be printed. Cf. *Mills v. Alabama,* 384 U. S. 214, 220 (1966). We have learned, and continue to learn, from what we view as the unhappy experiences of other nations where government has been allowed to meddle in the internal editorial affairs of newspapers. Regardless of how beneficient-sounding the purposes of controlling the press might be, we prefer 'the power of reason as applied through public discussion' and remain intensely skeptical

---

2. In *New York Times Co. v United States* (403 US 713), the "Pentagon papers" case, Mr. Justice BRENNAN clearly indicated that any "gag" of the press must be limited to one area, and one alone—that of national security. He there said (p 726): "Our cases, it is true, have indicated that there is a single, extremely narrow class of cases in which the First Amendment's ban on prior judicial restraint may be overridden. Our cases have thus far indicated that such cases may arise only when the Nation 'is at war,' *Schenck v. United States,* 249 U. S. 47, 52 (1919), during which times '[n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and locations of troops.' *Near v. Minnesota,* 283 U. S. 697, 716 (1931)."

That narrowly defined exception to the ban to the First Amendment on any prior restraint order is not really an exception, for every government has the inherent right to take measures against its own self-destruction.

about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press."

Since the context in which this controversy arises demands an expeditious determination of the issues, I forego a more extended discussion of the views here expressed, except to say that our recent national trauma, resulting in part from an attempted cover-up, should teach us that fungus grows in unlit places and that neither a government which imposes, nor a press which suffers from, the disease of secrecy is truly free.

COHALAN, RABIN and TITONE, JJ., concur with HOPKINS, Acting P. J.; SHAPIRO, J., concurs in result with a separate opinion.

Petition granted, without costs or disbursements, and respondent is prohibited from enforcing his oral orders of January 13 and 15, 1976, respectively, and his written order, entered January 20, 1976, and the said orders are vacated.