UNITED STATES of America, Plaintiff,

v.

Joseph Salim CHAGRA,
Defendant-Appellee,

v.

SAN ANTONIO LIGHT DIVISION OF the HEARST CORP., the Express-News Corporation and Tom Nelson, Movants-Appellants.

Nos. 82–1263, 82–1264.

United States Court of Appeals,
Fifth Circuit.

March 14, 1983.

Judith R. Blakeway, San Antonio, Tex., for San Antonio Light Div.

Mark Cannan, San Antonio, Tex., for The Express-News Corp. and Nelson.

Tonda F. Rush, Washington, D.C., for amicus curiae Reporters Committee for Freedom of Press.

Joseph (Sib) Abraham, Jr., Charles L. Roberts, El Paso, Tex., for Chagra.

Seagal V. Wheatley, San Antonio, Tex., for amicus curiae Seagal V. Wheatley.

Before RUBIN and JOHNSON, Circuit Judges, and DUPLANTIER *, District Judge.

ALVIN B. RUBIN, Circuit Judge:

The first amendment to the Constitution accords the public and the press the right of access to a criminal trial. We here consider whether that guarantee forbids a district court's closure of a pretrial bail reduction hearing when the defendant, to protect his right to a fair trial, requests that the hearing be held in camera.

I.

In 1979, United States District Judge John H. Wood, Jr. was shot in the back and

* District Judge of the Eastern District of Louisiana, sitting by designation.

killed as he prepared to enter his automobile outside his home in San Antonio, Texas. His assassination was immediately headline news in San Antonio and throughout much of the nation. For almost three years thereafter the FBI conducted what the press characterized as "the most extensive FBI investigation since the assassination of former President John F. Kennedy." The FBI agent who directed the investigation was quoted as describing the Wood murder as "the crime of the century." The press coverage of the murder and its investigation was described by reporters for San Antonio's major newspapers as "very extensive" and "intensive."

On April 15, 1982, an indictment was returned alleging that El Paso attorney Joseph S. Chagra, his brother Jamiel A. ("Jimmy") Chagra, his brother's wife, Elizabeth Nichols Chagra, Charles Harrelson, and Harrelson's wife, Jo Ann Harrelson, conspired to murder Judge Wood. The indictment also charged Harrelson and Jimmy Chagra with the actual murder of Judge Wood and accused all the defendants of conspiracy to obstruct justice. A separate indictment charged Joseph Chagra, Jimmy Chagra, Elizabeth Chagra and Leon Nichols with conspiracy to defraud the United States and attempted evasion of income taxes.[1] Understandably and predictably, the press treated the indictment as a major news story, affording it front-page headline status and publishing numerous stories covering various aspects of the case.

Bail for Chagra was set at $1,500,000 in the case involving the murder of Judge Wood and $100,000 in the income tax case. When Chagra moved for its reduction, a hearing on the motion was assigned to a United States Magistrate. The hearing commenced in open court. Chagra orally moved to bar the United States from introducing a statement made by him on March 20, 1982, to Federal Bureau of Investigation agents. He claimed that the statement was made during plea negotiations.[2] Chagra asked the magistrate to close the hearing on his motion because the evidence adduced there would, if publicized, prejudice his right to a fair trial. Reporters for the San Antonio Light and the San Antonio Express News objected to closure of the hearing. The government took no position. The magistrate ordered a portion of the hearing closed and sealed the transcript of the closed proceedings. The hearing was closed from 10:30 a.m. on April 22, 1982, until shortly after noon on the same day. The magistrate opened the remainder of that day's hearing to the public. However, he announced his intention to hear additional matters in camera the next morning.

The next day the magistrate held a hearing on the newspapers' objections to closure. Chagra again moved to close the bail reduction hearing during testimony concerning the admissibility of his March 20 statement. After hearing argument by counsel for the two newspapers and the defendant, the magistrate closed the remainder of the bail reduction hearing. He completed the hearing that day, certifying to the district court his conclusion that Chagra's statement to the FBI was admissible for the purpose of determining appropriate conditions of pretrial release.

Both newspapers asked the district court to vacate the magistrate's closure order, to

---

1. In all, Chagra was indicted on six counts: (1) conspiracy to murder Judge Wood in violation of 18 U.S.C. § 1117 (1976); (2) conspiracy to obstruct justice, 18 U.S.C. §§ 371, 1503 (1976); (3) conspiracy to possess marijuana with intent to distribute, 21 U.S.C. § 846 (1976); (4) possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1) (1976); (5) conspiracy to defraud the United States, 18 U.S.C. § 371 (1976); (6) attempting to evade income tax, 26 U.S.C. § 7201 (1976).

2. *See* Fed.R.Crim.P. 11(e)(6)(D):

(6) *Inadmissibility of Pleas, Plea Discussions and Related Statements.* Except as otherwise provided in this paragraph, evidence of the following is not, in any civil or criminal proceedings, admissible against the defendant who made the plea or was a participant in the plea discussions:

. . . .

(D) any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea later withdrawn.

make the sealed transcripts public, and to direct the magistrate to conduct all further proceedings in the Chagra case publicly. On April 27, 1982, Chief District Judge William S. Sessions heard arguments on the newspapers' motions. On April 29, Chief Judge Sessions entered a Memorandum Opinion and Order, concluding that there was "not a sufficient evidentiary basis in the record to support the Magistrate's order closing the courtroom to the members of the public and press," and that "the Magistrate did not give adequate consideration to the alternatives to closure that would protect the fair trial rights of the Defendant[s] . . . ." Accordingly, the court scheduled a hearing to accept evidence on the propriety of the magistrate's closure order.

The hearing was held on May 3, 1982. The newspapers were afforded a full opportunity to participate. On May 4, 1982, the district judge ruled that the magistrate's closure order was justified. In an opinion that followed his understanding of Justice Blackmun's dissenting opinion in *Gannett Co. v. DePasquale*, 443 U.S. 368, 406, 99 S.Ct. 2898, 2919, 61 L.Ed.2d 608, 638 (1979), he first concluded that public dissemination of the exhibits and transcripts of the closed bond reduction hearing would create a serious threat to Chagra's right to a fair trial. He found that substantial publicity concerning the Chagra case had been disseminated in San Antonio and throughout the state. In addition, he found that "extensive publicity" would likely continue. Noting the "speculative and accusatory" nature of the publicity already surrounding the case, the court anticipated substantial difficulty in empaneling an impartial jury.

The district judge further determined that the newspapers' circulation was concentrated in communities where most of the prospective jurors for a trial in San Antonio resided. Therefore, he thought it "very likely" that the evidence adduced at the closed hearings, if released, would reach a "substantial percentage" of the prospective jurors. Moreover, the district judge concluded that the sealed record contained information "of a highly prejudicial and inflammatory nature" that "could not be easily purged through voir dire."

Concluding that public dissemination of the information in the closed hearing would "in reasonable likelihood create a serious threat" to Chagra's fair trial right, the district judge then considered the alternatives to closure, principally moving the trial elsewhere in Texas, and found "a strong likelihood that they would not adequately protect the Defendant's fair trial rights." Finally, the district judge considered whether closure would be effective in protecting against the perceived harm to Chagra's fair trial right. He decided that it would. Recognizing that he should impose only those restrictions necessary to assure a fair trial, the judge declared that the magistrate properly closed portions of the bail reduction hearing and ordered the transcript of those hearings to remain sealed.

. Later Chagra and the other defendants each moved for a change of venue. The district judge deferred final ruling on these motions. Explaining the reasons for his action fully in a fourteen-page order, he stated that he would first attempt to select a fair and impartial jury through voir dire in the San Antonio Division. If successful, he would then deny the motions. If unsuccessful, he would reconsider the motions and determine an appropriate forum. Portions of the resumed bond hearing were closed on May 4, 1982. Segments of hearings on other pretrial motions, ranging from 15 minutes to one hour and 45 minutes, were closed at various times from August 4, through August 13, 1982. However, these closures are not challenged in this appeal.

Then the shape of the case changed completely. A summary of Chagra's March 20 statement was introduced and made public at a pretrial hearing held on April 12, 1982. Moreover, after this appeal was filed, Chagra entered a plea of guilty to conspiracy to murder. The plea was pursuant to a plea bargain in which it was agreed that Chagra would testify against all the defendants charged with Judge Wood's murder except his brother and would, in return, receive a

ten-year sentence. A jury was selected for the trial of defendants Elizabeth Chagra, Charles Harrelson and Jo Ann Harrelson. The judge, therefore, denied their motion for a change of venue. Venue for the murder trial of Jimmy Chagra was changed to Jacksonville, Florida.

## II.

■■■ We consider first several preliminary questions, starting with the appealability of the order, for it was, of course, interlocutory. *See In re Chicken Antitrust Litigation,* 669 F.2d 228, 235 (5th Cir.1982). However, some orders entered during the course of a trial are final in effect and appealable by virtue of what is known as the collateral order doctrine. *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The decisive factors are whether the order at issue: (1) is a final disposition by the district court; (2) is collateral to the rights asserted in the main action; (3) entails a risk of irreparable injury; and (4) involves a serious and unsettled question of law. *United States v. Gurney,* 558 F.2d 1202, 1206–07 (5th Cir.1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978). Applying these tests in *Gurney,* we found that the collateral order doctrine permitted a similar appeal from a closure order. *Id.; see generally* 9 J. Moore, B. Ward & J. Lucas, Moore's Federal Practice ¶ 110.10 (1982); 15 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3911 (1976).

■■■ The issue has not been rendered moot by the completion of the hearing to which access was sought. The controversy is capable of repetition under circumstances in which each repetition may evade review.

*See Globe Newspaper Co. v. Superior Court,* —— U.S. ——, ——, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248, 254 (1982); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 563, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973, 981 (1980) (plurality opinion); *Gannett Co. v. DePasquale,* 443 U.S. 368, 377–78, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608, 619–20 (1979). We turn, then, to the question of the standing of the appellants to prosecute this appeal and, if they have the right to appeal, whether there are before us those adversary parties essential to the existence of a case or controversy.

The newspapers and reporter, none of whom was a party to the criminal case, seek relief only by appealing the trial court's order; they have not sought mandamus. Chagra disclaims further personal interest in restricting access to the transcript and exhibits of the closed bond hearing. He states only that "the rights to a fair trial of *other* defendants sought to be disclosed [sic] are involved." (Emphasis added.) Those other defendants have not sought to intervene or to appear in any fashion. Indeed, the murder trial of the Harrelsons and Elizabeth Chagra has already resulted in a verdict of guilty and Jimmy Chagra's trial on the murder indictment was recently completed in Jacksonville, Florida. The prosecution has never supported closure and has not opposed press access to the closed hearings or to the transcripts of those hearings.

"Ordinarily only a litigant *who is a party below* and who is aggrieved by the judgment or order may appeal." *Burleson v. Coastal Recreation, Inc.,* 572 F.2d 509, 511 (5th Cir.1978) (emphasis added; cites omitted).[3] However, the right to appeal is not expressly limited to parties by the relevant statute. 28 U.S.C. § 1291 (1976).[4] "[I]f the

---

3. *Accord Washoe Tribe v. Greenley,* 674 F.2d 816, 818 (9th Cir.1982); *United States v. Conforte,* 643 F.2d 641, 643 (9th Cir.1981); *Hoover v. Switlik Parachute Co.,* 663 F.2d 964, 966 (9th Cir.1981); *Union of Professional Airmen v. Alaska Aeronautical Ind.,* 625 F.2d 881, 884 (9th Cir.1980); *Coffey v. Whirlpool Corp.,* 591 F.2d 618, 619 (10th Cir.1979) (per curiam); *SEC v. An-Car Oil Co.,* 604 F.2d 114, 119 (1st Cir.1979); *Pennsylvania v. Rizzo,* 530 F.2d 501, 507–08 (3d Cir.), *cert. denied,* 426 U.S. 921, 96

S.Ct. 2628, 49 L.Ed.2d 375 (1976); *Moten v. Bricklayers, Masons and Plasterers Int'l Union,* 543 F.2d 224, 227 (D.C.Cir.1976); *United States v. McFaddin Express, Inc.,* 310 F.2d 799, 800 (2d Cir.1962).

4. The full text of the statute is:
 The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and

decree affects [a third party's] interests, he is often allowed to appeal." *West v. Radio-Keith-Orpheum Corp.,* 70 F.2d 621, 624 (2d Cir.1934).

Thus, a non-party may appeal orders for discovery if he has no other effective means of obtaining review.[5] Similarly, non-parties have been allowed to appeal orders granting[6] or denying[7] further disclosure of documents already in the possession of a court or grand jury. Non-party creditors who assert rights in receivership proceedings may appeal orders affecting their legitimate interests.[8] If an injunction extends to non-parties, they may appeal from it.[9] Similarly, a non-party may generally appeal an order holding him in civil contempt.[10] Attorneys and experts, though non-parties, may sometimes appeal orders relating to their fees.[11] Finally, unindicted co-conspirators may appeal an order refusing to strike their names from the indictment.[12]

The courts differ on whether the media, though not parties to a case, may appeal closure orders or must seek other avenues of review.[13] Some, including ours, have allowed such appeals. *See Belo Broadcasting Corp. v. Clark,* 654 F.2d 423, 425–26 (5th Cir.1981); *United States v. Gurney,* 558 F.2d 1202, 1206–07 (5th Cir.1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978); *United States v. Schiavo,* 504 F.2d 1 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 690, 42 L.Ed.2d 688 (1974); *R.W. Page Co. v. Lumpkin,* 249 Ga. 576, 292 S.E.2d 815 (1982); *State v. Allen,* 73 N.J. 132, 373 A.2d 377 (1977). Others allow an appeal after one of the media has "intervened" in the underlying action for the purpose of challenging the closure order. *See United States v. Criden,* 675 F.2d 550, 552 (3d Cir.1982); *United States v. Cianfrani,* 573 F.2d 835 (3d Cir.1978); *News American Div., Hearst Corp. v. State,* 294 Md. 30, 43–46, 447 A.2d 1264, 1271–72 (1982); *Patuxent Publishing Corp. v. State,* 48 Md.App. 689, 429 A.2d 554 (1981); *Keene Publishing Corp. v. Cheshire County Superior Court,* 119 N.H. 710, 406 A.2d 137 (N.H. 1979); *Richmond Newspapers, Inc. v. Com-*

the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court.

**5.** *See, e.g., United States v. Nixon,* 418 U.S. 683, 692, 94 S.Ct. 3090, 3099, 41 L.Ed.2d 1039 (1974); *Branch v. Phillips Petroleum Co.,* 638 F.2d 873, 877–79 (5th Cir.1981); *In re Grand Jury Applicants,* 619 F.2d 1022, 1025 (3d Cir. 1980); *Overby v. United States Fidelity & Guaranty Co.,* 224 F.2d 158, 162 (5th Cir.1955).

**6.** *See, e.g., Perlman v. United States,* 247 U.S. 7, 12, 38 S.Ct. 417, 419, 62 L.Ed. 950, 952 (1918) (owner may appeal order releasing civil case exhibits to government for use in grand jury proceedings); *Petrol Stops Northwest v. United States,* 571 F.2d 1127, 1128–29 (9th Cir.1978) (owners could appeal order granting release of grand jury documents to plaintiffs in private antitrust action), *rev'd on other grounds,* 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979); *United States v. Hubbard,* 650 F.2d 293, 308–13 (D.C.Cir.1980) (owner can appeal order making criminal case exhibits public); *United States v. RMI Co.,* 599 F.2d 1183, 1186 (3d Cir.1979) (owner can appeal denial of motion brought as de facto intervenor to prevent disclosure to defendants of records furnished to indicting grand jury).

**7.** *See, e.g., Smith v. National Provisioner, Inc.,* 589 F.2d 786, 788–89 (5th Cir.1979) (House of Representatives officials could appeal denial of

their motion to modify protective order so that party could comply with House subpoena for documents).

**8.** *SEC v. Lincoln Thrift Ass'n,* 577 F.2d 600, 602–03 (9th Cir.1978); *West v. Radio-Keith-Orpheum Corp.,* 70 F.2d 621, 623–24 (2d Cir. 1934).

**9.** *Brown v. Board of Bar Examiners,* 623 F.2d 605, 608 (9th Cir.1980); *Commercial Security Bank v. Walker Bank & Trust Co.,* 456 F.2d 1352 (10th Cir.1972).

**10.** *Union of Professional Airmen v. Alaska Aeronautical, Ind.,* 625 F.2d 881, 884 (9th Cir. 1980).

**11.** *Lipscomb v. Wise,* 643 F.2d 319 (5th Cir. 1981) (attorney); *Dietrich Corp. v. King Resources Co.,* 596 F.2d 422, 424 (10th Cir.1979) (expert).

**12.** *United States v. Briggs,* 514 F.2d 794 (5th Cir.1975).

**13.** *See generally* Rendleman, *Free Press—Fair Trial: Restrictive Orders After* Nebraska Press, 67 Ky.L.J. 867, 879–88 (1979); Rendleman, *Free Press—Fair Trial: Review of Silence Orders,* 52 N.C.L.Rev. 127 (1973).

*monwealth,* 222 Va. 574, 281 S.E.2d 915 (1981). A few courts have reviewed closure orders on application for a writ of certiorari. *See Edward A. Sherman Publishing Co. v. Goldberg,* 443 A.2d 1252 (R.I.1982); *Rapid City Journal Co. v. Circuit Court,* 283 N.W.2d 563 (S.D.1979).

Other courts, noting that non-parties may not generally appeal, hold that closure orders are reviewable only on petition for writs of prohibition or mandamus. *See United States v. Brooklier,* 685 F.2d 1162, 1165 (9th Cir.1982); *Sacramento Bee v. United States District Court,* 656 F.2d 477, 481 (9th Cir.1981), *cert. denied,* 456 U.S. 983, 102 S.Ct. 2257, 72 L.Ed.2d 861 (1982); *United States v. Sherman,* 581 F.2d 1358, 1360 (9th Cir.1978); *CBS, Inc. v. Young,* 522 F.2d 234, 237 (6th Cir.1975); *State ex rel. Gore Newspapers Co. v. Tyson,* 313 So.2d 777 (Fla.Ct.App.1975).[14] In the District of Columbia, a motion filed by the press objecting to a closure order is treated as initiating a separate miscellaneous civil proceeding. *See United States v. Mitchell,* 386 F.Supp. 639, 640 (D.D.C.1975). Taking yet another approach, the court in *State v. Bianchi,* 92 Wash.2d 91, 92–93, 593 P.2d 1330, 1331 (1979) (en banc), indicated that closure orders could be challenged by a separate action for declaratory judgment, mandamus, or prohibition.

■ The rule previously adopted by this circuit compels our adherence.[15] This appeal is, therefore, properly before us.

### III.

The constitutional limitation that we consider only cases or controversies "limit[s] the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *GTE Sylvania, Inc. v. Consumers Union,* 445 U.S. 375, 382, 100 S.Ct. 1194, 1199, 63 L.Ed.2d 467 (1980); *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968).

**14.** Indeed, the great majority of cases involving challenges to closure and similar orders have been reviewed pursuant to some sort of extraordinary writ. In addition to the cases cited in the text, *see, e.g., In re Express News Corp.,* 695 F.2d 807 (5th Cir.1982); *Central S. Car. Chap., Society of Prof. Journalists v. Martin,* 556 F.2d 706 (4th Cir.1977); *Phoenix Newspapers, Inc. v. Superior Court,* 101 Ariz. 257, 418 P.2d 594 (1966) (en banc); *Commercial Printing Co. v. Lee,* 262 Ark. 87, 553 S.W.2d 270, 272–73 (1977) (en banc); *Oxnard Publishing Co. v. Superior Court,* 68 Cal.Rptr. 83 (Cal.Ct. App.1968); *State ex rel. Miami Herald Publishing Co. v. McIntosh,* 340 So.2d 904 (Fla.1976); *Gannett Pacific Corp. v. Richardson,* 59 Hawaii 224, 580 P.2d 49 (1978); *Honolulu Advertiser, Inc. v. Takao,* 59 Hawaii 237, 580 P.2d 58 (1978); *Des Moines Register & Tribune Co. v. Osmundson,* 248 N.W.2d 493 (Iowa 1976) (en banc); *Ashland Pub. Co. v. State,* 612 S.W.2d 747, 753 (Ky.Ct.App.1980); *Northwest Publications, Inc. v. Anderson,* 259 N.W.2d 254, 256–57 (Minn.1977); *State v. Simants,* 194 Neb. 783, 236 N.W.2d 794 (1975), *rev'd on other grounds sub nom Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *State ex rel. New Mexico Press Ass'n v. Kaufman,* 98 N.M. 261, 648 P.2d 300 (1982); *Oliver v. Postel,* 30 N.Y.2d 171, 331 N.Y.S.2d 407, 282 N.E.2d 306 (1972); *New York Times v. Starkey,* 51 A.D.2d 60, 380 N.Y. S.2d 239 (App.Div.1976); *State ex rel. Beacon Journal Publishing Co. v. Kainrad,* 46 Ohio St.2d 349, 348 N.E.2d 695 (1976); *E.W. Scripps*

*Co. v. Fulton,* 100 Ohio App. 157, 125 N.E.2d 896, *appeal dismissed as moot,* 164 Ohio St. 261, 130 N.E.2d 701 (1955) (per curiam); *Oklahoma Publishing Co. v. District Court,* 555 P.2d 1286 (Okl.1976), *rev'd on other grounds,* 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977); *Philadelphia Newspapers, Inc. v. Jerome,* 478 Pa. 484, 387 A.2d 425 (Pa.1978), *appeal dismissed,* 443 U.S. 913, 99 S.Ct. 3104, 61 L.Ed.2d 877 (1979); *Seattle Times v. Ishikawa,* 97 .Wash.2d 30, 640 P.2d 716, 719 (Wash.1982) (en banc); *Federated Publications, Inc. v. Kurtz,* 94 Wash.2d 51, 615 P.2d 440 (1980) (en banc); *State ex rel. Newspapers, Inc. v. Circuit Court,* 65 Wis.2d 66, 221 N.W.2d 894 (1974); *Charlottesville Newspapers v. Berry,* 215 Va. 116, 206 S.E.2d 267 (1974); *Herald Ass'n v. Ellison,* 138 Vt. 529, 419 A.2d 323, 324 (1980). Connecticut by statute allows appeal by "any person affected by a court order which prohibits any person from attending any session of court." Conn.Gen.Stat. § 51–164X(a) (1981).

**15.** Judge Rubin observes that, were he free to consider the question *de novo,* he would require review by mandamus. This would not shut the appellate door to those genuinely aggrieved by a district court order, but would allow review under the different standards applicable to mandamus, with the greater expedition afforded such motions. Judges Johnson and Duplantier think the present procedure is preferable.

It is thus "elemental that there must be parties before there is a case or controversy." *Ellis v. Dyson,* 421 U.S. 426, 434, 95 S.Ct. 1691, 1696, 44 L.Ed.2d 274, 282 (1975). *See generally* 13 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure ¶ 5350, at 59 (Supp.1980). In a mandamus action, even if there is no longer an adverse party, the writ is directed to the judge as the respondent. Fed.R.App.P. 21(a). In this case, as discussed above, our jurisdiction to consider extraordinary writs was not invoked.

After Chagra lost interest in this case, the court was presented an issue without an opponent. The newspapers and reporter were before us to present their position on a question of importance. But there was no one to present the other side. Without opponents, the adversary system cannot function. That their erstwhile contestant had retired from the field was not the fault of the appellants, but our jurisdiction is not predicated on the blamelessness of the party who invokes it.

 The issue is, however, of continuing importance to the appellants, to the district court, and to other courts frequently presented with such problems. Following the precedent first established by the Supreme Court when one of the erstwhile adversaries in a case before it withdrew, a precedent later followed by the Third Circuit, we, therefore, appointed counsel as amicus curiae to support the decision of the district court. *See Mathews v. Weber,* 423 U.S. 261, 265 n. 2, 96 S.Ct. 549, 552 n. 2, 46 L.Ed.2d 483, 489 n. 2 (1976); *United States*

*v. Criden,* 675 F.2d 550, 553 n. 4 (3d Cir. 1982).[16] Because we find that the appeal is properly before us and a case or controversy is presented, we proceed to the merits.

 In doing so, we reject appellants' suggestion that the district court should have ordered the transcript of the hearing unsealed immediately upon concluding that the magistrate had established an insufficient evidentiary basis for closure. He retained statutory power to "accept, reject, or modify" the magistrate's order, and was authorized to "receive further evidence" in considering whether to do so. 28 U.S.C. § 636(b)(1) (Supp. V 1981). His options were not limited to the wholesale acceptance or rejection of the magistrate's order.

## IV.

 The first amendment guarantees the public and the press the right to attend criminal trials unless it is demonstrated that some curtailment of that right is required "to protect defendant's superior right to a fair trial or that some other overriding consideration requires closure." *Richmond Newspapers v. Virginia,* 448 U.S. 555, 564, 100 S.Ct. 2814, 2821, 65 L.Ed.2d 973, 982 (1980) (Burger, C.J., joined by White and Stevens, JJ.). "Although there was no opinion of the Court in [*Richmond Newspapers*], seven Justices recognized that this right of access is embodied in the First Amendment . . ." *Globe Newspaper Co. v. Superior Court,* —— U.S. ——, ——, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248, 254 (1982).[17] While Justice Powell did not participate in *Richmond Newspapers,* his con-

16. A copy of our order appointing amicus curiae follows this opinion as Appendix A.

17. Chief Justice Burger's *Richmond Newspapers* opinion recognized a "right of access" or a "right to gather information based in part on a right of access to places or proceedings traditionally open to the public." 448 U.S. at 563, 100 S.Ct. at 2820, 65 L.Ed.2d at 981. Justices Brennan and Marshall viewed the origin and structure of the right differently. For them, the right stemmed from the ingrained tradition of public trials and the importance of public access to information about the operation of government, *Id.* at 598, 100 S.Ct. at 2839, 65 L.Ed.2d at 1003, but they endorsed the principle that trials must be open, reserving judgment on the question "what countervailing interests might be sufficiently compelling to reverse this presumption of openness." *Id.* Justice Blackmun would have reached the same result under the sixth amendment, but he concluded, "as a secondary position, . . . the first amendment must provide some measure of protection for public access to trial." *Id.* at 604, 100 S.Ct. at 2842, 65 L.Ed.2d at 1007. Only Justice Rehnquist dissented. *See generally,* Note, Public Trials and a First Amendment Right of Access: A Presumption of Openness, 60 Nebraska L.Rev. 169 (1981).

curring opinion in *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1974) recognized a first amendment right to attend judicial proceedings. *Id.* at 397–405, 99 S.Ct. at 2914–17, 61 L.Ed.2d at 632–37. We start, then, on the firm premise that the public and the press have a right of access to criminal trials.

The closure at issue here, however, was of a pretrial motion to reduce bail. Thus, *Richmond Newspapers* does not, by itself, provide the answer in this case. In *Gannett,* the Court ruled that the sixth amendment does not guarantee the public or press the right to attend pretrial suppression motion hearings. 443 U.S. at 391, 99 S.Ct. at 2911, 61 L.Ed.2d at 628. That decision, however, did not resolve the existence of a first amendment right to attend pre-trial hearings. The majority assumed that such a right existed but ruled that it had not been abridged. *Id.* at 392, 99 S.Ct. at 2911, 61 L.Ed.2d at 629. The dissent explicitly did not reach the issue of first amendment access. *Id.* at 447, 99 S.Ct. at 2940, 61 L.Ed.2d at 664. Justice Rehnquist thought it clear that no such first amendment right existed. *Id.* at 404, 99 S.Ct. at 2918, 61 L.Ed.2d at 636–37. Only Justice Powell stated that he would "hold explicitly" that the newspaper reporter "had an interest protected by the First and Fourteenth Amendments in being at the pretrial suppression hearing." *Id.* at 397, 99 S.Ct. at 2914, 61 L.Ed.2d at 632 (footnote omitted).

Since *Richmond Newspapers* and *Gannett* were decided, the Third and Ninth Circuits have recognized a first amendment right to attend pretrial suppression motion hearings.[18] *United States v. Brooklier,* 685 F.2d 1162, 1169–71 (9th Cir.1982); *United States v. Criden,* 675 F.2d 550, 555 (3d Cir.1982). These decisions rely primarily on the nature of the suppression motion hearing, "often ... the most critical stage of a criminal proceeding." *Criden,* 675 F.2d at 556. Moreover, each court noted that the suppression hearing often involves questions of great public concern, such as the propriety of police conduct, and, therefore, awakens the same reasons for public access as the trial itself. *Brooklier,* 685 F.2d at 1170–71; *Criden,* 675 F.2d at 557.

One recent decision addresses directly the public's right to access to hearings concerning conditions of pretrial release. In *United States v. Edwards,* 430 A.2d 1321, 1343–46 (D.C.App.1981) (en banc), the District of Columbia Court of Appeals held that the press and public enjoy a first amendment right of access to pretrial detention hearings. The court reviewed the policies underlying the tradition of open judicial proceedings and found them applicable to hearings on pretrial release. *Id.* at 1344–45.[19]

In *Richmond Newspapers,* the Court stressed the "unbroken, uncontradicted history" of public trials in recognizing a first amendment right of access. 448 U.S. at 573, 100 S.Ct. at 2825, 65 L.Ed.2d at 987 (plurality opinion); *see also id.* at 602, 100 S.Ct. at 2841, 65 L.Ed.2d at 1006 (Blackmun, J., concurring). Bond reduction hearings do not have a similar history. Although bail is most often set at the defendant's first appearance before a magistrate or justice of the peace,[20] presumably in open

---

**18.** *See also United States v. Dorfman,* 690 F.2d 1230, 1234 (7th Cir.1982) (recognizing "general right of access on the part of the public to court proceedings" in context of appeal concerning closure of suppression hearing). In *Sacramento Bee v. United States District Court,* 656 F.2d 477, 481–82 (9th Cir.1981), *cert. denied,* 456 U.S. 983, 102 S.Ct. 2257, 72 L.Ed.2d 861 (1982), the court recognized a first amendment right of access to suppression hearings held during the course of a trial. Several courts have also recognized a first amendment right of access to *voir dire* proceedings. *See United States v. Brooklier,* 685 F.2d 1162, 1166–69 (9th

Cir.1982); *United States ex rel. Pulitzer Publishing Co.,* 635 F.2d 676 (8th Cir.1980).

**19.** *See also Herald Ass'n v. Ellison,* 138 Vt. 529, 419 A.2d 323, 324 (1980) (although *Richmond Newspapers* did not explicitly recognize first amendment right of access to pretrial hearings, it is "fair to imply" that such a right exists). *But see San Jose Mercury-News v. Municipal Court,* 30 Cal.3d 498, 506, 179 Cal.Rptr. 772, 777, 638 P.2d 655, 660 (1982) (en banc; no federal constitutional right to access to pretrial proceedings).

**20.** *See* A.B.A. Project on Standards for Criminal Justice, Standards Relating to Pretrial Re-

court, this is not always the procedure. The initial bail determination is often made by the judge when an indictment is returned or by the magistrate when an arrest warrant issues; the amount is endorsed on the warrant.[21] In the case of state offenses a common procedure is for a nonjudicial officer, such as the police desk sergeant, to set bail in accordance with a fixed schedule.[22] Even in the federal system, magistrates do not always make the bail determination in open court. Their decision may also be made at home or in chambers. State magistrates sometimes fix amounts at the police station, or during telephonic communications with the jail.[23] These informal procedures serve an important purpose. They allow the expeditious release of the defendant.

Access to bail reduction hearings, however, should not be foreclosed because these proceedings lack the history of openness relied on by the *Richmond Newspapers* court. In *Criden,* the Third Circuit noted that the "relative importance of pretrial procedure to that of trial has grown immensely in the last two hundred years." 675 F.2d at 555. Bail procedures have likewise become more significant. The Federal Bail Reform Act of 1966, Pub.L. No. 89–465, 80 Stat. 214–16 (1966) (codified at 18 U.S.C. §§ 3141–3156 (1976)), has been described as "the most significant legislative reform of the criminal process of this century."

Duke, *Bail Reform for the Eighties,* 49 Fordham L.Rev. 40, 46 (1980). Because the first amendment must be interpreted in the context of current values and conditions, *Criden,* 675 F.2d at 555; *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 386–95, 89 S.Ct. 1794, 1804–09, 23 L.Ed.2d 371, 386–92 (1969), the lack of an historic tradition of open bail reduction hearings does not bar our recognizing a right of access to such hearings. *See* BeVier, *Like Mackerel in the Moonlight: Some Reflections on* Richmond Newspapers, 10 Hofstra L.Rev. 311, 325–28 (1982).

The first amendment right of access is, in part, founded on the societal interests in public awareness of, and its understanding and confidence in, the judicial system. *Criden,* 675 F.2d at 556. Moreover, public access is a check on judicial conduct and tends to improve the performance both of the parties and of the judiciary. *Id.* These interests are as affected by proceedings to determine conditions of pretrial release as they are by other judicial proceedings.

■ Pretrial release proceedings require decisions that attract significant public interest,[24] and invite legitimate and healthy public scrutiny.[25] We, therefore, agree with the Third Circuit's conclusion that "the same societal interests . . . that mandated a first amendment right of access to criminal trials in *Richmond Newspapers* apply" to

---

lease 2 (Approved Draft 1968); P. Wice, Freedom for Sale 24 (1974).

**21.** D. Freed & P. Wald, Bail in the United States 19 (1964).

**22.** P. Wice, *supra* note 20, at 23; D. Freed & P. Wald, *supra* note 21, at 18–19.

**23.** *See* P. Wice, *supra* note 20, at 25, 37; D. Freed & P. Wald, *supra* note 21, at 20; Foote, *Compelling Appearance in Court: Administration of Bail in Philadelphia,* 102 U.Pa.L.Rev. 1031, 1044 (1954).

**24.** It was recently noted that the appropriate conditions of pretrial release:

have provided the grist for a debate among legislators, judges and commentators that has increased both in intensity and in importance. Public interest—perhaps growing out of increased concern about the physical safety of the populace, perhaps fanned by in-

creasing media reports of atrocious crimes allegedly committed by bailed defendants—is currently very great.

F. Miller, R. Dawson, G. Dix & R. Parnas, Criminal Justice Administration 613 (2d ed. 1982).

**25.** To cite a recent example,

It has been noted that "the whole uncovering [of the Watergate Scandal] might have been cut off at the pass by closing the original bail hearing to the press. That way, reporters Bob Woodward and Carl Bernstein could hardly have noticed that high-priced lawyers were representing 'third-rate burglars.'"

Fenner & Koley, *Access to Judicial Proceedings: to* Richmond Newspapers *and Beyond,* 16 Harv.C.R.—C.L.L.Rev. 415, 436 n. 109 (1981) (quoting Zion, High Court v. The Press, N.Y. Times, Nov. 18, 1979, § 6 (Magazine), at 45).

pretrial criminal proceedings, *Criden,* 675 F.2d at 557, and we extend this to bail reduction hearings. However, the right of access "extends no farther than the persons actually present at the time the motion [for bail] is made . . ." *Gannett,* 443 U.S. at 401, 99 S.Ct. at 2916, 61 L.Ed.2d at 634 (Powell, J., concurring). Therefore, while the public and press may request access to bail hearings held in court or other places that traditionally are open to the public, nothing in this opinion should be construed as forbidding the more informal bail procedures discussed above.

### V.

Recognition of a right of access by the public and the press does not obliterate the differences between trial and pretrial, nor does it fix the judicial scales against closure beyond counterweight. Despite the categorical language of the first amendment, the rights it safeguards are not absolute. Like the freedom to speak,[26] the freedom to publish,[27] the freedom to exhibit movies,[28] and other first-amendment-protected rights, the right of courtroom access is limited by the constitutional right of defendants to a fair trial,[29] and "by the needs of government to obtain just convictions and to preserve the confidentiality of sensitive information and the identity of informants."[30] Evidence adduced at bail-setting procedures may present a serious threat to the defendant's fair trial right. Evidence may be considered in a bail reduction hearing that would not be admissible at trial. Fed.R.Evid. 1101. Moreover, some of the alternatives available to reduce the danger of prejudice at trial, like sequestration of the jury, are simply unavailable at the pretrial bail reduction hearing.

The Court in *Richmond Newspapers* held that, absent "an overriding interest articulated in the findings, the trial of a criminal case must be open to the public," 448 U.S. at 581, 100 S.Ct. at 2830, 65 L.Ed.2d at 992 (plurality opinion), but it did not explain when an interest would be considered sufficiently overriding.

■ Two justices have suggested different standards for weighing the defendant's fair trial rights against the public's right to access. Justice Blackmun's dissenting opinion in *Gannett* suggested that a defendant seeking closure of a pretrial suppression hearing must establish that "it is strictly and inescapably necessary in order to protect his fair-trial guarantee," 443 U.S. at 440, 99 S.Ct. at 2936, 61 L.Ed.2d at 660. Under this view, the defendant must, at a minimum, establish that: (1) there is a "substantial probability that irreparable damage to his fair-trial right will result" from opening the proceeding; (2) alternatives to closure cannot adequately protect his fair trial right; and (3) there is a "substantial probability" that closure will be effective in protecting against the perceived harm. *Id.* at 442, 99 S.Ct. at 2937, 61 L.Ed.2d at 661. Justice Powell proposed a similar test, but would require the defendant only to "make some showing that the fairness of his trial likely will be prejudiced by public access to the proceedings." *Id.* at 401, 99 S.Ct. at 2916, 61 L.Ed.2d at 635. The Judicial Conference of the United States has approved the less stringent standard proposed by Justice Powell. *See* Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free-Press—Fair Trial" Issue, 87 F.R.D. 519, 535 (1980). The Justice Department has also adopted this standard.

---

**26.** *See Heffron v. International Soc. for Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

**27.** *See New York Times v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam).

**28.** *See Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

**29.** *See, e.g., Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).

**30.** *Gannett Co. v. DePasquale,* 443 U.S. at 398, 99 S.Ct. at 2915, 61 L.Ed.2d at 633 (Powell, J., concurring).

28 C.F.R. § 50.9 (1982). We hold that a defendant seeking closure of a pretrial bond reduction hearing overcomes the first amendment right of access to that hearing if he shows that:

(1) his right to a fair trial will likely be prejudiced by conducting the hearing publicly;

(2) alternatives to closure cannot adequately protect his fair trial right; and

(3) closure will probably be effective in protecting against the perceived danger.

██ The district judge applied this test in substance. He expressly found that Chagra's right to a fair trial would be endangered by unsealing the transcript of the bond reduction hearing. He carefully considered the alternatives to closure. He found that closure would be effective. These conclusions have substantial support in the record.

In considering whether a change of venue would adequately protect Chagra's rights, the district judge apparently considered only the possibility of changing venue to another location in Texas. He rejected this alternative because he found that publicity had been pervasive throughout the state. Because a change of venue within Texas was not the only available option, he should have considered the desirability of a change to a district in another state, as permitted by Fed.R.Crim.P. 21. Indeed, Jimmy Chagra's recent trial on the murder indictment was conducted in Florida. The first amendment rights of the media must be balanced on a scale that weighs also the rights of the defendant and the prosecution. While the district judge should have considered expressly whether a change of venue to a district in another state would have adequately protected Chagra's rights, he should also have considered whether the defendant was willing to waive his constitutional right to be tried in the state where the crime was committed, U.S. Const. Art. III, § 2, cl. 3, and the corresponding right under the Federal Rules of Criminal Procedure to be tried in the district in which the offense was committed. Fed.R.Crim.P. 18. He should also have considered impediments to a fair trial that would be created by a change of venue, including the additional cost to the defendant and the government, the additional difficulty to the defendant of conducting his defense in a distant venue, and whether publicity would be equally intensive in the alternative venue. Given the present procedural posture of the case, we find it unnecessary to remand for a consideration of these factors. If there was any error, it is now harmless.

## VI.

There is no single divine constitutional right to whose reign all others are subject. When one constitutional right cannot be protected to the ultimate degree without violating another, the trial judge must find the course that will recognize and protect each in just measure, forfeiting neither and permitting neither to dominate the other. The public enjoys a first amendment right of access to pretrial bond reduction hearings. That right, however, must accommodate other constitutional rights.

In the present case, the district judge accorded all the parties a fair hearing. With one exception, now insignificant, he properly considered all of the relevant factors, and made a determination that has substantial support in the record.

For these reasons, the order is AFFIRMED.

## APPENDIX A

### ORDER:

Joseph Salim Chagra was indicted for, *inter alia*, conspiracy to murder United States District Court Judge John H. Wood, Jr. After he applied for bond reduction, the district court closed to the public a part of the bond reduction hearing and sealed the transcript of that hearing. Two newspapers and a reporter appealed. On September 17, 1982, while this appeal was pending, Chagra pled guilty to conspiracy to murder in violation of 18 U.S.C. § 1117

(1976). The plea was entered pursuant to a plea bargain agreement that apparently resolved the remaining charges against Chagra.

On September 20, 1982, we asked counsel for each party to the appeal to comment on whether a case or controversy continued to exist with respect to the district court's order. Chagra's response stated in part: "The Appellee does not appear to be in an adversary position to Appellants at this juncture and does not claim such a position."

This case has not been rendered moot by either the completion of the bond reduction hearing or by Chagra's guilty plea. The controversy is capable of repetition, yet evading review. *See Globe Newspaper Co. v. Superior Court,* —— U.S. ——, ——, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 563, 100 S.Ct. 2814, 2820, 65 L.Ed.2d 973 (1980); *Gannett Co. v. DePasquale,* 443 U.S. 368, 377–78, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979). Nevertheless, the case or controversy requirement of Article III "limit[s] the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *GTE Sylvania, Inc. v. Consumers Union,* 445 U.S. 375, 382, 100 S.Ct. 1194, 1199, 63 L.Ed.2d 467 (1980); *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968).

To ensure that this appeal continues to be presented in an adversary context, Seagal V. Wheatley, Esq., Suite 620, 711 Navarro Street, San Antonio, Texas, 78205, is hereby appointed *amicus curiae* to support the decision of the district court. *See Mathews v. Weber,* 423 U.S. 261, 265 n. 2, 96 S.Ct. 549, 552 n. 2, 46 L.Ed.2d 483 (1976); *United States v. Criden,* 675 F.2d 550, 553 n. 4 (3d Cir.1982). Amicus is invited to review the record and briefs already filed in this matter, confer with the district court, and to inform this court within seven days whether he wishes to file a brief supplementing that filed by appellant. If amicus wishes to file a brief, he should advise the court as to the period of time needed to prepare the brief. In addition, amicus is invited to participate in all further proceedings in this matter and, at the appropriate time, to file a petition for rehearing or suggestion for rehearing en banc, and to file a petition for certiorari, if he thinks that such actions are appropriate.

/s/ Alvin B. Rubin
UNITED STATES CIRCUIT JUDGE
for the Court

DUPLANTIER, District Judge, specially concurring:

I concur in the result, and in most of what is said in the panel opinion. However, I respectfully disagree with the last paragraph of Part V of the panel opinion and with the phrase at the beginning of the final sentence of the opinion dealing with the same subject matter.

The trial judge properly concluded that much "highly prejudicial" information would be brought to the attention of the magistrate at the bond reduction hearing, information which would not be admissible evidence at trial. The judge also correctly decided that public disclosure of that information at that time would have significantly prejudiced the right of the government and the defendant to a fair trial. In my view, that should end the inquiry.

The San Antonio press had no right to a change of venue so as to permit it to publish this information prior to trial. Moreover, if a trial judge grants a defendant's motion for a change of venue, he has a multitude of factors to consider in selecting the new location. We should not add another: the judge should not be required to widen the distance between the place where the indictment was brought and the trial, so as to accomodate the desire of the local press to publicize highly prejudicial material shortly before trial.